# Rash *v.* The State.

*Indictment for Murder.*

1. *Venire; what not good ground of objection to.*—A mistake in writing out in the list served on the prisoner, the surname of one of the jurors specially summoned for the trial of a capital felony, is not ground for quashing

[Rash v. The State.]

the venire, or stopping the trial; such name should be discarded and another juror summoned.

2. *Challenge to juror; when right of, waived.*—After jurors have been accepted and sworn, it is too late to enter into further inquiry as to their qualifications, or to challenge any of them.

3. *Service of list of jurors on prisoner, presumption as to.*—In the absence of anything showing the contrary in the record, and of any question made in the court below, it will be presumed that the list of names of persons summoned as jurors for the trial of a capital felony, was duly served upon the prisoner as required by law.

4. *Juror, presumption as to qualification of.*—Where the name of a person was drawn, whereupon he was accepted as a juror, and the defendant, his peremptory challenges having been exhausted, did not object, it must be presumed, the record being silent on the subject, that the juror possessed proper qualifications.

5. *Expert, opinion of; when admissible.*—A physician and surgeon of "long experience with gun-shot wounds, and an expert in such matters," who saw the body of the deceased shortly after she received a wound, may give his opinion as to how it was inflicted.

6. *Same; what evidence inadmissible.*—One who had been in the late war, and "saw the range of balls in a good many gun-shot wounds, but was not a physician, or a surgeon, or an expert," can not be permitted to testify as to "how the balls range, and some of the wounds which the witness had seen."

7. *New trial.*—The Supreme Court has no power to grant a new trial.

APPEAL from Circuit Court of Colbert.

Tried before Hon. W. B. WOOD.

Charles Rash, the appellant, was convicted of the murder of his wife, and sentenced to be hanged.

The bill of exceptions states that the defendant was in jail when the list of jurors summoned for his trial was served upon him. On this list appeared the name of *John H.* Lockwell, though there was no evidence that there was any person of that name. In drawing the names from the hat, the name of *James* H. Lockwell was drawn, whereupon the defendant informed the court, that this last name did not appear on the list served upon defendant, and "objected to proceeding further with the trial;" but the objection was overruled and the defendant excepted. The court ordered the name of John H. Lockwell to be discarded, and that another juror be summoned and his name placed in the hat. The defendant objected to this, but his objection was overruled, and he excepted. The sheriff summoned another juror, whose name was placed in the hat, and the drawing proceeded.

" After the jury had been completed and sworn, but before any testimony was introduced, the defendant objected to proceeding further with the trial, because neither of said jurors had been examined, and ascertained to possess the qualifications of jurors in cases of this kind. Neither of them had been asked whether they were connected by con-

[Rash v. The State.]

sanguinity in the ninth degree, or by affinity in the fifth degree, computing according to the rules of civil law, with the prosecutor or person alleged to have been slain. And defendant offered to prove by witnesses that no such questions had been asked, and the fact that such questions had not been asked was admitted. The court overruled the defendant's objection, and he duly excepted."

When eleven jurors had been obtained, the list served on defendant was exhausted, and the court ordered the sheriff, forthwith to summon two other jurors, which was done, and their names put in the hat. "These jurors were challenged, whereupon two other persons were summoned, and their names placed in the hat. The first of these, when his name was drawn, was challenged, which exhausted the defendant's peremptory challenges. The other name was then drawn, and the juror accepted by the State, and, no objection being made by the defendant, he was sworn."

On the morning of the evening on which defendant's wife was shot, defendant asked his wife who took the eggs out of his hen's nest, and she answered that she did, as she had nothing else to eat. Defendant told her that the next time she did it, he would break her head, and becoming angry, struck her a light blow with a paddle used for cleaning dirt off his plow. Defendant said to her at the same time, that if his dog had been alive she would have laid the taking of the eggs on the dog; that he (defendant) had turned up a four-legged dog, and would turn up a two-legged dog, if any more of his eggs were taken. The defendant then went into the field to work. On the same evening, about an hour before sunset, as one Prince testified, "witness passed by defendant's cabin; that he was on his mule, and said to witness that his gears were broken and he wanted them mended. Witness told him when he returned from the well, which was about seventy yards distant, he would help defendant fix the gear; that defendant assented, and said he would wait until witness came back; that about the time witness reached the well he heard a gun fire at defendant's cabin, and witness then ran back to the cabin; that before he got there he heard defendant calling for witness' father; that when witness reached the cabin, he found deceased sitting in a chair near the door, with her head thrown back, and insensible, and defendant holding and supporting her head and crying; that he asked defendant why he shot his wife, and defendant said his wife shot herself with a gun accidentally, and stated that his wife was sitting in a chair near the door, with the gun

[Rash v. The State.]

standing nearer the door on her left; that a cradle about two feet high was on her right; that he (defendant) went in and told his wife he was going hunting; that she objected, and seized the gun with her left hand, drew it behind her back, seized it with her right hand, and in drawing it to her, it came in contact with the cradle, fired off and shot her near the right ear."

The gun was an Enfield rifle, which was long and heavy, and there were powder stains around the wound. When the witness entered, the gun was lying several feet behind defendant, with the breech next to him.

Dr. Huston, "who was shown to be a physician and surgeon of more than forty years experience with gun-shot wounds, and an expert in such matters," testified on behalf of the State, that he examined the deceased about two hours after she was shot, and found that she had been shot in the right ear, from the effects of which she died. The shot did not follow the aperture of the ear, but passed behind, tending obliquely backwards and downward, for three-fourths to an inch, lodging at the base of the skull. "This witness, in answer to a question by the solicitor, stated that from the condition of the wound, the ear of deceased must have come in contact with a hard substance." To this question and the answer thereto the defendant objected, but his objection was overruled, and he excepted.

The defendant then introduced a witness, who was familiar with gun-shot wounds and the range of balls, who testified " that a slight contact of a ball with a substance, would often change the range of a ball, either up or down, or to one side."

The defendant then "introduced R. O. Pickett, who testified that he had been a Confederate officer in the late war, and saw the range of balls in a good many gun-shot wounds, but was not a physician, or surgeon, or an expert. The defendant then offered to prove by the witness, how the balls range, and some of the wounds he had seen." The State objected to the evidence, and the court sustained the objection, and defendant excepted. The bill of exceptions does not profess to set out all the evidence.

The judgment-entry, after reciting the arraignment, plea, &c., and the rendition of the verdict, recites that "the defendant being brought to the bar, and asked by the court if he had anything to say why sentence of the law should not be pronounced against him, according to the verdict of the jury so found, made his statement. It is thereupon considered," &c.

[Rash v. The State.]

It does not affirmatively appear from the record that the list of jurors summoned for defendant's trial, was served upon him one entire day before the day set for the trial; but no objection was raised on this account in the court below. ·

The various rulings to which exception was reserved, are now assigned as error, as also that a list of jurors summoned for the trial was not served on the prisoner one entire day, before the day set for the trial.

JAMES JACKSON, JOSEPH GILBERT, and J. B. MOORE, for appellant.—The record should show affirmatively that the list of the jury was served one entire day before the day appointed for the trial. It appears affirmatively that defendant was in actual custody.—Code, § 4872; *Johnson v. State*, 47 Ala. 30. Lewis' case, 51 Ala. 1, is not in conflict with former cases. Lewis was not shown to have been in custody. The court erred in its ruling as to the juror Stockwell.—Code, § 4872; *Johnson v. State, supra.* It was error to swear the jurors without ascertaining their qualifications. 52 Ala. 351.

The court erred in allowing Dr. Huston to answer the question of the solicitor. A medical man may prove the cause of death, the consequences of wounds; and their opinions may be given in evidence, whenever the nature of the subject-matter is such as " to call for their study, in order to qualify a man to understand it."—1 Greenl. Ev. 440. Huston's answer did not come under either head. It is the same thing as if he had been allowed to state that from the range of the ball, the breech of the gun must have been elevated and the muzzle depressed. This was the very matter which the jury had to solve. It was the vital question.—40 Cal. 272; 49 Mo. 274; 35 Iowa, 107. Pickett's testimony should have been admitted. If he was experienced in such matters, it was not necessary that he should be an expert.—13 Ala. 68; 35 Ala. 555. The twelfth juror was put upon defendant without his consent. He was not asked whether he would accept the juror. The record shows that the defendant "*made his statement*," when asked why judgment should not be pronounced. He did say something. What was it? It is not recited that this statement amounted to nothing " in bar or preclusion " of judgment. It is idle to ask the question, if the defendant can not get the benefit of it. This court should reverse, or grant some remedial process whereby what defendant did say may be passed on here.

Looking at the evidence set out in the bill of exceptions,

it seems the *weakest evidence* that ever a human being was sentenced to death upon. His own declarations were introduced by the State. They showed the killing was accidental. He is found supporting the head of his wife and crying and calling for help.

The range of the ball, three-fourths of an inch downward, without any proof whatever of the position of deceased's head at the time the gun fired, seem to have been seized on by the jury. And in the face of his conduct on the occasion, and his solemn declaration made at the time, establishing his innocence, this man is condemned to death. Has all reasonable doubt been excluded? Are the facts and circumstances of a conclusive tendency? If upon this evidence, all of which is set out in the bill of exceptions, any one of the fundamental rules of circumstantial evidence has been violated, would it not be the duty of this court to reverse the judgment?

H. C. TOMPKINS, Attorney-General, *contra*.

STONE, J.—1. The rulings of the Circuit Court, in reference to the juror Lockwell, were in precise accordance with the statute, Code of 1876, § 4876, as construed in *Floyd v. The State*, 55 Ala. 61, and are free from error. Neither did the court err in refusing, after the jurors had been accepted and sworn, to allow further inquiry, or challenge of jurors. Questions as to the qualification of jurors, not previously raised, must be treated as waived, when the jurors for the trial of a felony are accepted and sworn.—*Smith v. The State*, 55 Ala. 1. It should be observed, however, that in this case, no offer appears to have been made in the court below, to show that any of the jurors were related, by consanguinity or affinity, to the deceased or the accused.—See *Drake v. The State*, 51 Ala. 30.

2. The judgment-entry fails to show that a list of the jurors, summoned for defendant's trial, was served on him one entire day before the trial. If necessary, we would presume this was done, in the absence of objection in the court below that it was not done, or other statement of the record, rebutting the presumption.—*Paris v. The State*, 36 Ala. 232; *Lewis v. The State*, 51 Ala. 1.

But the bill of exceptions in this case, made part of the record, shows that a list of the jurors was so served. The cases of *Robertson v. The State*, 43 Ala. 80; *Flanagan v. The State*, 46 Ala. 703; *Bugg v. The State*, 47 Ala. 50, and *Mor-*

[Newsom v. Thornton, Adm'r.]

*gan v. The State*, 48 Ala. 65, have been heretofore overruled. *Lewis v. The State, supra.*

3. There is nothing in the objection that the twelfth juror was put on defendant without his consent. He had exhausted his peremptory challenges, and could not challenge further, except for cause. The silence of the record must be regarded as evidence that no legal reason existed why the juror should not be received as a juror for the trial of the case.

4. The Circuit Court pursued the law in its rulings on the testimony of experts.—*Tullis v. Kidd*, 12 Ala. 648; *Bush v. Jackson*, 24 Ala. 273; *Bennett v. Fail*, 26 Ala. 605; *Johnson v. The State*, 35 Ala. 370.

5. We are asked to reverse this case, because it is said the whole evidence is before us, and that it did not justify the conviction. We need scarcely say, what has been many times said, that under our system, this court has no power to grant a new trial. Such applications are addressed to the enlightened discretion of the primary court trying the cause. If that court refuse a new trial, and if the record show no reversible error in the court's rulings, there is no redress, save in the pardoning or commuting power of the executive, if the case be one to call for it. We express no opinion on the testimony found in this record. But the record does not show or affirm that it contains all the evidence.

The judgment of the Circuit Court is affirmed, and it is ordered and adjudged that on Friday, the 28th day of March, 1879, the sentence of the law pronounced in this cause be executed, by hanging the said Charles Rash by the neck until he is dead; and the sheriff of Colbert county is charged with the execution of this sentence.