# STATE *v.* JUSTUS.

GRAND JURY.—Under a statute which provides that "no person other than the district attorney can be allowed to be present during the sittings of the grand jury," it is improper, although authorized by such district attorney, for a stranger to be present during the sittings of the grand jury for the purpose of aiding them in the examination of witnesses, but such irregularity after trial and verdict, and without any suggestion of injustice or unfairness to the prisoner, is not a sufficient ground for reversal.

EXPERIMENTS, to furnish data for certain inferences, must be based as nearly as possible upon conditions and circumstances like those existing in the case at trial; otherwise, their tendency is to mislead and confuse the jury.

EXPERIMENTS made upon paste boards with the gun with which the deceased was killed, by non-professional witnesses, to show powder burns, for the purpose of establishing by inference that the deceased came to his death from the effect of a near gun-shot wound; *Held,* Inadmissible.

EXPERTS—GUNSHOT WOUNDS.—When the killing is not susceptible of direct proof, and the fact in issue, whether the ball was fired near or from the distance, depends for a correct determination upon the appearances of the wound, that fact and its experienced consequences, does not belong to the ordinary information of men, but lies exclusively within the limits of a particular department of medical science, and requires to be proved by persons skilled in it, the better to enable the jury to reach a correct conclusion.

WITNESSES—NON-PROFESSIONAL.—It cannot be considered safe to permit non-professional witnesses to prove, through the instrumentality of experiments, matters not within the range of their observation and experience, and with which they are presumed to be incompetent to deal. But even if it can be considered as a matter of doubt whether such evidence was proper, or otherwise, we should feel bound in *favorem vitae* that in this case it was inadmissible as it was pressed by the state as of vital consequence.

CARELESSNESS—DEATH FROM.—The general rule is that a party whose negligence causes the death of another is responsible, whether the business in which he was engaged was legal or illegal. If the business was of such a character as to be felonious, the offense is murder, but where it is perfectly legal, negligence in the discharge of it, when producing homicide, is manslaughter. To this rule, there may be exceptions, as where an act, careless in itself, is committed with fatal results, under circumstances or at a place from which it might be reasonably inferred that no injury could happen from the carelessness of the party acting.

APPEAL from Jackson County.

*R. Williams, B. F. Dowell and J. R. Neil*, for appellants.

*P. P. Prim*, for respondent.

By the Court, LORD, J.:

The appellant was indicted by the grand jury of Jackson county for the crime of murder in the first degree, committed by shooting and killing William Justus, his father; for which he was tried at the June term of the circuit court of that county, and found guilty as charged, and sentenced to be hanged. From that judgment he brings his appeal to this court. Among the errors relied upon to question the correctness of that judgment and secure a new trial, is the fact, as disclosed by the record, that a person, not authorized by law, was present before the grand jury, at the request of the district attorney, for the purpose of assisting them in the examination of witnesses, and in framing the indictment. That any person other than the dis-

trict attorney should be permitted to be present during the sittings of the grand jury, must be admitted to be highly improper. "No person other than the district attorney," is the emphatic language of the statute, "can be allowed to be present during the sittings of the grand jury." But, *non constat*, that the error is fatal? In *State* v. *Whitney*, 7 Or., 356, it was held, on a motion to set aside an indictment involving this identical question, that it was only the two cases enumerated in subdivisions 1 and 2 of section 115, of the criminal code, for which such a motion was available. "These," say the court, "are the only two cases for which an indictment can be set aside; and as the section prohibiting any other than the district attorney from appearing before the grand jury is not in chapter 7, there was no error in the ruling of the court." "But irregularities in the proceedings before the grand jury," says Mr. Bishop, "may under some circumstances be taken advantage of upon a motion to quash the indictment." But a motion to quash must be made at an early stage in the case, for it is inadmissible after verdict, as then the motion should be in arrest of judgment. (1 Bishop Crim. Proceed., secs. 747, 748, 762.) In *Duer* v. *The State*, 53 Miss., 425, where the court permitted an attorney, who had been employed to assist in a prosecution, to go before the grand jury with the witnesses, and there act for the district attorney in framing the indictment, it was considered doubtful whether the objection could be raised by motion to quash the indictment, the court saying: "We regard it as bad practice, and certainly as being much more appropriately done by plea in abatement." But a plea in abatement does not answer to the charge made by the indictment, but it declines to answer it on the ground that the charge is not legally made. (Bacon's Ab. Juries A.) And if the objection is not made

at an early stage of the proceedings, it will be considered as waived; for, as was said in *The State* v. *Carver*, 49 Maine, 593, by pleading generally to the indictment, the defendant admits its genuineness, and waives all matters that should have been pleaded in abatement. (*The People* v. *Robinson*, 2 Park C. R., 235, 309.) Now here the objection comes for the first time after trial and verdict upon a motion for a new trial. At most, it is but an irregularity, but of that character which does not bring into question the qualifications of the grand jurors or their fairness toward the accused. Nor is it claimed that any injustice or wrong was done to the prisoner by reason of this alleged error at the trial. Upon authority it is clear the objection cannot prevail.

The next assignment of error is the overruling the objection of the appellant to the admission of certain pasteboard targets as evidence. It appears by the bill of exceptions that one James Birdseye, by direction of the coroner, and in the presence of the coroner's jury, made several experiments with the gun, with which the defendant claimed he had accidentally killed his father, by discharging it at certain targets made out of pasteboard, at different distances, respectively marked upon them. The coroner, Mr. Huffer, being on the witness stand, the prosecuting attorney, in the presence of the jury, exhibited to him these targets, to the admission of which the objection was made, which he identified, and further testified as follows: that "he saw the defendant's gun tested at different distances, and that the distances were marked respectively on the targets; that he saw the gun loaded when the experiments were made; that the loads of powder were a charger full, and that the charger was the one on the pouch used by the defendant." Birdseye, who had loaded and fired the gun, testified: "I loaded

the gun, using the powder flask which the defendant said he loaded from when he killed his father. I filled the charger level full each time I loaded the gun. The distances on the targets are all correct." At the coroner's jury, the defendant had testified among other things that he had taken the gun at the suggestion of his father, and had gone out and shot a squirrel the dogs had treed. He says: "I started from the front porch to put the gun away; I came in near the door or through it to put the gun away; we generally keep the gun sitting behind the partition door on a stand table. I was in here and had just started in, the gun being cocked. If I remember rightly, I had the gun lying across my left arm and I started across the floor to put it away, it being cocked. I went to let the hammer down. I don't know whether or not I had hold of the hammer. I went to let the hammer down and touched the trigger I suppose before I got hold of the hammer, and the gun went off. I was about six feet from the door when the gun went off, that is I think that was the distance. I suppose it is about the same distance to where my father was sitting in the chair when the gun went off.

With this explanation we now come to the pasteboard targets which were admitted in evidence against the objection of the defendant. Their object was to rebut the defense of accidental killing by showing that the statements of the prisoner upon which this defense was based, was inconsistent with what it was claimed the inferences from the target experiments would prove to be the circumstances of the case. As no one was present, except the prisoner, when the deceased was killed, and as his statements were inconsistent with the theory of a "near" gun shot wound which the prosecution claimed was the cause of the death, the object of the experiments, made on the paste board targets which

were offered in evidence, was to prove by inference that the
deceased came to his death by a near gun shot wound in the
hands of the defendant.   This was the vital question in-
volved in the issue, and to which the evidence excepted to,
was directed.   But here it must be noted that the witnesses
who made these experiments were not experts, and were,
therefore, unable to express an opinion whether the phe-
nomena indicated by near gun shot wounds upon the human
body corresponded in appearance with the phenomena ex-
hibited as the result of their experiments, thereby connect-
ing the similarity of the fact offered to be proved with the
fact in issue; but it was proposed to show only the phe-
nomena produced by near gun shots on the pasteboard tar-
gets, from which it was claimed the jury were qualified and
authorized to infer similar phenomena would be produced
by near gun shot wounds on the human body, and which,
as a result of such inferences, would serve to illustrate the
gun shot wound from which the deceased died, and thereby
establish the point in issue that the deceased was killed by
a near gunshot wound.   Is the evidence of such experi-
ments admissible for the purposes claimed?   Gun shot
wounds belong to a branch of medical science, and often
give rise to many questions of a difficult nature, although
generally a gunshot wound is easily distinguished.   And
among the questions frequently rising is, was the ball fired
near the deceased, or from the distance.   Observation and
study, however, in this department of science have noted
and described with much exactness the appearance and
character of gunshot wounds.   In "near" wounds, as they
are termed, when the muzzle is placed near the surface of
the body of the deceased, when fired, the characteristics of
the wound is thus described:   1. A superficial bluish color
of the skin from the contusion caused by the explosion.   2.

Particles of charcoal and ignited powder imbedded in the skin. 3. Slight burning. 4. Coagulation of blood mixed with powder on the lips of the wound. If the muzzle is placed in direct contact when exploded, the wound is large and circular, the skin denuded, blackened and burned, and the point at which the ball entered is livid and depressed. (Dear's Med. Jr., 241; Wharton & Stilte's Med. Jr., 707; Taylor's Med. Jr., 329; Beck's Med. Jr.)

Now it must be manifest that there are here noted so many marked characteristics of near gunshot wounds which could by no possibility be reproduced, or represented by experiments upon pasteboard, yet upon which the fact of a near wound is made to depend, and often to be determined, that it would be utterly unsafe to apply the inferences sought to be deduced from such experiments to the fact in dispute, unless there can be found in such experiments, and the subject matter which it is their object to explain or illustrate, some point of similitude or ground of common resemblance, always present, as a result induced by a similarity of conditions or circumstances. It may be suggested that some identity of resemblance may be traced in the powder burns exhibited by the experiments as the result of near shots, and in the wounds of the deceased which the medical authorities indicate, are usually, if not always present in "near" wounds. But when, as here, the case is not susceptible of direct proof, and the fact in issue—whether the ball was fired near or from the distance—depends of necessity for a correct determination, upon the appearance of the wound, the fact and its experienced consequences does not belong to the ordinary information of men, but lies within the limits of a particular branch of medical science, and requires to be proved by persons skilled in it, the better to enable the jury to reach a safe conclusion. In *Rush* v. *State,* 61 Ala., 89,

it was held that one not a surgeon or expert, although he had been in war, and seen the range of balls in gunshot wounds, was properly excluded from testifying on a trial for murder by shooting. It would seem, then, hardly to be safe to permit non-professional witnesses to prove, through the instrumentality of experiments matters, not within the range of their observation and experience and of which they are supposed to be incompetent to deal. But besides this, when it is considered how much other marked character-istics in conjunction with powder burns aid in determining the fact of near wounds—what seemingly immaterial circumstances—even the kind or compound of the wadding used, may affect the appearance of gunshot wounds, how fundamentally different is the human body in nature and texture from the substance upon which the experiments were made; and when it is considered how important it is that experiments should be based on conditions and circumstances as nearly as possible like the matter they are intended to illustrate to avoid the liability to misconception, or error from some supposed agreement or resemblance, we should certainly hesitate to admit such experiments as evidence unless supported by reason or sanctioned by authority.

In *Commonwealth* v. *Piper*, 120 Mass., 188, it is held that unless the experiments are shown to have been made under conditions the same as those existing in the case on trial, the tendency is to confuse and mislead the jury. (*Edit* v. *Cutler*, 127 Mass., 523.) And in all the cases which have come under our observation, where such evidence has been held as admissible, the experiments were made with like means on the same kind of stuff or substance, or were based on a similarity of conditions or circumstances whereby the results produced betray with some certainty and uniformity, a common similitude or agreement, and as a

consequence thereof furnish a safe foundation for inference, or the truth of the matter sought to be established. In *State* v. *Blair*, found in the notes to Wharton's Criminal Evidence, sec. 312, the experiments admitted in evidence were made with the same kind of pistol on the same kind of stuff as that of which the outer garments of Armstrong, the person shot, were made. But in *Commonwealth* v. *Twichell*, 1 Brewster, 566, where the object of the experiments was to ascertain the facility of breaking a human skull with a poker, and the witness testified that he had made experiments upon another skull with a poker like the poker with which the skull of the deceased had been broken, the evidence was rejected. In *Smith* v. *State*, 2 Ohio St., 513, the evidence of the experiments, which was decided ought to have been admitted, showed the experiments to have been made under similar conditions and like circumstances to the act in issue. Again, in *Sullivan* v. *Comwonwealth*, 93 Penn. St., 285, the deceased was shot through her gown in the abdomen, and the experiments were made by a physician upon similar stuff with the same pistol loaded with cartridges out of the same box, who, at the trial, was called as an expert to show the effect of powder marks where a pistol is fired at short range, and it was held that his testimony and the muslin used in his experiments were admissible. But even if it be considered a matter of doubt whether the evidence objected to was proper or otherwise, we should feel bound in *favorem vitae* to hold that in this case it was inadmissible, as it was pressed by the state as of vital consequence.

The next assignment of error is the refusal of the court to give an instruction asked for by counsel for the defendant, to the effect, that if there was a reasonable doubt in the mind of the jury as to whether the killing was done pur-

posely, and of deliberate and premeditated malice, or accidentally, they should give the benefit of that doubt to the prisoner and find him not guilty. The error alleged to be in such an instruction is, that the jury might believe the killing to have been accidental, and still consistently found the defendant guilty of manslaughter. In *The State* v. *Hardie,* 47. Iowa, 647, it was held: 1. That if one use a dangerous and deadly weapon in a careless and reckless manner, whereby another is killed, the party so using the dangerous weapon is guilty of manslaughter, even though no harm in fact is intended. 2. That the degree of care in one handling a dangerous weapon is not the highest degree of care and prudence, but only such care as a reasonably prudent man would exercise under like circumstances. To the same effect is *Chrystal* v. *Commonwealth,* 9 W. P. D. Bush. R., 671, in which the court say: "It is insisted for the appellant, with force and plausibility, that if when he discharged the pistol he did not intend by having it in his hands to discharge it, or to do any unlawful act with it, his accidental killing of Ott could not have amounted to a felony, however gross may have been his carelessness in the use of the weapon; and we are referred to the case of *Golliher* v. *Commonwealth,* (2 Duvall, 163,) as sustaining this argument. But after a careful consideration of the question we are unable to find in the case cited, or any other decision of this court, any departure from the general rule when applied to a case like this, that "whatever may be the difference as to degrees of homicide, a party whose negligence causes the death of another is in like manner responsible, whether the business in which he is engaged was legal or illegal. If the business was of such a character as to be felonious, the offense, it is clear, is murder. But even where the business is perfectly legal, negligence in the discharge of it when producing

homicide is manslaughter." To this general rule there may be exceptions, as where an act careless in itself, is committed with fatal results under circumstances, or at a place from which it might be inferred that no injury could happen from the carelessness of the party acting. There was no error in this assignment. But from the views before expressed, the judgment must be reversed and a new trial ordered.