PETER LA BEAU, Plaintiff in Error, *v.* THE PEOPLE, Defendants in Error.

On a trial of the prisoner for the crime of murder by poisoning, it is competent to prove that he had threatened injury to the deceased by means of other instruments — as, by a "slung-shot" — as tending to prove the *animus* of the prisoner toward the deceased.

The extent of the cross-examination of a witness upon matters immaterial to the issue, is in the discretion of the judge before whom the trial is had.

Inquiries on irrelevant topics, to discredit the witness, are within the same rule; but such inquiries should be excluded with great caution. Per PECKHAM, J.

THE plaintiff in error was indicted and tried at the St. Lawrence Oyer and Terminer, in February, 1865, on a charge of administering poison to one Julius Denny, with intent to kill, which poison, by the said administering, was actually taken by said Denny, &c. (See 2 R. S., 666, § 37.) The indictment contained four counts, all charging the same offense, though in different words.

On the trial it appeared that in September, 1864, Denny was brakeman on the night freight train of the Northern Railroad, and also kept a boarding house in the village of Ogdensburgh. The plaintiff in error, La Beau, was one of his boarders. The train on which Denny was employed usually reached Ogdensburgh about half-past one o'clock in the morning, and left, on the return trip, at two o'clock. Denny's meals were prepared at home, and carried with him on the train. On the 19th September he reached Ogdensburgh at the usual hour, and, as was his custom, went to his home to have his dinner pail replenished. His wife let him into the house and put up the victuals for him, consisting of buttered bread (the buttered sides together), nut cakes and crackers. He ate some of the bread and butter on returning to the train, and soon fell sick, and when the Lawrence station was reached, had to be taken from the train. The physician called found him in convulsions, and concluding that he had been poisoned by strychnine, administered the proper remedies, and he afterward recovered. A chem-

ical analysis of the contents of the dinner pail was made, and strychnine found in the bread and butter. Strychnine, a deadly poison, had, undoubtedly, been mingled with the bread and butter prepared for him on the occasion, either by Denny's wife or by the prisoner, and the jury found that it was the guilty act of the latter.

La Beau had boarded with Denny some two years prior to the poisoning, during all of which time he had had adulterous intercourse with the wife of the latter. She admitted that she had been accustomed to lie with him for two years or more, and on the night of the 19th September he was lying with her until shortly before Denny came to the house, and resumed his place in her bed soon after he left. Their intimacy was of the most shameless and profligate character.

Mrs. Denny was the principal witness, on the part of the prosecution, to connect La Beau with the commission of the offense. Her testimony was, in substance, this: La Beau was a widower; was a blacksmith, working in the shop of the railroad company, and had boarded at Denny's house for over two years. In the spring of 1864, he spoke to her two or three times respecting her husband's health; stated that he knew Denny was going to die, and she would be left a widow, and asked her, in that event, if she would marry him. In the summer, she had a conversation with him about procuring poison. He said he wanted to go hunting foxes and bears when the time came, and if he could get some good poison, he would not work any more, but would hunt foxes and bears. He asked her to go to Prescott, in Canada, and get him some poison, saying that he could not get any that was good in Ogdensburgh. The morning before the poisoning, at La Beau's request, she went to Prescott to get poison for him, he furnishing the money to pay for it. He gave her a dollar bill, telling her to change it in Ogdensburgh, as it would not pass in Prescott, which she did, and got a half dollar in silver for it. The poison was bought of Dr. Harding, at Prescott, put in a bottle and appropriately labeled.

She reached home between 11 and 12 o'clock, and went directly to La Beau's room, where she kept her clothes. Her statement was, that she placed the poison on La Beau's wash-stand, in a place that he could see it, whilst the package was hidden from the view of persons entering the room. She locked the door of the room, and put the key in her pocket. Saw La Beau at noon as he came to dinner, and handed him the key of the room. He inquired of her whether she had been to Prescott, and upon her replying that she had, he went directly to his room. She was in his room that afternoon, but not when he was there; did not see the bottle containing the poison then; never saw it again, or any of the contents that she knew of. La Beau left after dinner, and returned with the other boarders to tea between 6 and 7 o'clock. After tea he remained at the house. She went to his room about half-past 8 o'clock that night; he was not inclined to let her in, but finally opened the door. She left his room about 9 o'clock, he saying to her to go to her room and he would be there in a few minutes. She went down stairs and left the back door open for him. About fifteen minutes afterwards he was in her bedroom. He came the back way, through his window on to the shed roof, and through the woodshed into the house, and then to her room. He went first into the cupboard off the dining room, and she heard him rattle the knives. He then went to the buttery where the bread and butter was kept. He did not remain there long, but came running to her room, and said he heard some one coming down stairs and did not wish any one to catch him in the buttery. He did not go out of the room again. Soon afterwards she left the room to put up her husband's victuals, as she was in the habit of doing. Went to the cupboard, got a knife, and then to the buttery for the bread and butter. She found two pieces of bread buttered. They were small-sized pieces, cut square. The pieces looked fresh, and they were soft, and she took them and laid them down, side by side, on the plate. Did not use any bread except what she found spread. She put cakes and crackers on the plate with the bread and butter, and left the whole in the cup-

board. La Beau was in her room while she was doing this. She went back to her room, and La Beau remained with her until about one o'clock in the morning. He had been gone from her about an hour when her husband came home. She let him in. He brought a lantern with him. She went into the dining room, and then into the cupboard, got the bread and butter, and put it into his pail in the dining room in his presence, and then went to bed. Denny was a part of the time in the buttery. He staid but a few minutes, came to her room and kissed her, and left. She got up and locked the door after him; and soon afterwards La Beau returned, and occupied her bed for the remainder of the night.

In the afternoon of the 19th, La Beau, Mrs. Denny and others of Denny's household were arrested on the charge of poisoning him. La Beau and Mrs. Denny occupied opposite cells in the lock-up at Ogdensburgh. Whilst there, as she testified, she conversed with La Beau. He inquired what she was crying for, when she replied that she had a right to cry, being shut up there for nothing. He said she need not cry, that he would take all on his charge; he would not try to put anything on her back; that she must not tell that she got any poison for him. Afterwards he refused to talk with her; it scared her, and she told the district attorney about it.

Ellen Gardner, a sister of Mrs. Denny, a girl about sixteen years old, was working for her at the time of her arrest. She testified that she cleared off the table after tea, the night before the poisoning. She had no recollection of any pieces of bread and butter being left; and did not see any in the buttery when she put away the things. After La Beau's arrest his room was searched, but no poison was found.

There was evidence tending to show that La Beau and Denny were not, at all times, on friendly terms; and that, on one or two occasions, the prisoner had uttered threats, indicating a hostile and malicious feeling toward Denny.

The case was submitted to the jury, under a charge of the court, to which no exception was taken, and the jury found the prisoner guilty.

On the trial, Mrs. Denny testified to twice going to La
Beau's room the night of the poisoning; the second time
about half-past eight o'clock. His door was locked, and he
refused at first to let her in, but finally opened the door. As
she entered the room he held his hand down by his side, and
she inquired what he had in it, and, after some importunity,
he showed her what it was. The district attorney then inquired,
"what was it?" The prisoner's counsel objected to the
question, on the ground that it was immaterial and incompe-
tent; but the court overruled the objection, and the witness
answered: "It was a ball covered with a kind of red
leather." The district attorney then proposed to produce a
"slung shot" for identification by the witness. To the pro-
duction of which the prisoner objected, but the objection was
overruled and an exception taken. (A leaden ball covered with
leather was here produced and identified.) The witness contin-
ued: "I asked La Beau what it was. He said it was a slung
shot. I asked him what he was going to do with it. He
said it was going through Julius' (her husband's) head."

On the cross-examination of Mrs. Denny, she testified that
she had been having carnal connection with La Beau for
some time before he came to her house to board — some two
or three months before. The following question was then
put to her by the prisoner's counsel: "Were you in the habit
of having sexual connection with other men than your hus-
band before you had carnal connection with La Beau?" The
district attorney objected to the question, and the court sus-
tained the objection, and the prisoner excepted. The pris-
oner's counsel then put this question: "Were you not in the
constant habit of having sexual connection with Lawrence
Morney, David La Ventun, Charles Seguin and A. Seguin
for the last four years?" The district attorney objected to
the question and answer, and the court sustained the objec-
tion, and the prisoner excepted.

The court denied a motion of the prisoner's counsel to sus-
pend the sentence until the decision upon a case to be made
for reviewing the several exceptions taken on the trial.

The prisoner's counsel brought error to the Supreme Court, where the judgment was affirmed; and from that judgment the prisoner brings error to this court.

*C. G. Myers*, for the plaintiff in error.

*B. H. Vary*, district attorney, for the defendant in error.

WRIGHT, J. It is a felony, by statute, to " administer, or cause and procure to be administered, any poison to any human being, with intent to kill such being, and which shall have been actually taken by such being." (2 R. S., 666, § 37.) The plaintiff in error was indicted for administering, or causing and procuring to be administered, to one Julius Denny, a deadly poison, with intent to kill, and was tried and convicted of the offense at the St. Lawrence Oyer and Terminer, in February, 1865. The indictment contained four counts; and the prisoner's counsel, assuming that different offenses were charged, and that one count was bad for duplicity, moved that the public prosecutor be compelled to elect upon which count or offense charged in the indictment he should proceed to try the prisoner, and that the fourth count be stricken out for duplicity. The motion was denied, and an exception taken, but was not pressed on the argument at bar. The motion, undoubtedly, was properly disposed of. All the counts charged substantially the same statutory offense, and neither was bad for duplicity.

A principal point is now made that obviously we cannot consider, viz.: that the prisoner was convicted of the offense charged against him upon insufficient evidence. To constitute an *administering*, within the meaning of .the statute, it is insisted that something must be done or said beyond the single act of mingling poison with food, which may be taken by a human being, and that although there was some evidence tending to the conclusion that the prisoner poisoned the food given to Denny, there was none whatever showing that he handed the food so poisoned to him, or that he advised, suggested, did or said anything to induce him to partake of it. We cannot entertain any question in

respect to the sufficiency or strength of the evidence that produced the conviction; nor is the question as to what constitutes an *administering*, within the act, before us.    There was no allusion to the point on the trial; a construction of the statute was not sought; and as no ruling on the subject was requested, and no exception taken to the charge to the jury, it is to be assumed that they were rightly instructed as to the law of the case; at least the plaintiff in error is not in a position to allege aught to the contrary.

It was proved by Mrs. Denny, that a short time before the administration of the poison, the prisoner was engaged in covering a leaden ball with leather, which he said was a "slung shot," and upon her inquiring what he was going to do with it, he replied, "it was going through Julius' head." A leaden ball, covered with leather, was then produced, and identified by the witness as the instrument which she saw in the possession of the prisoner, and which he called a "slung shot." It was produced and identified, under objection of his counsel, and this is now claimed to have been error. I think otherwise.    The state of the prisoner's mind toward Denny was a fact of some significance.    Evidence tending to show that he was at enmity with Denny, and entertained toward him a malicious intent, and a purpose to do him personal injury, was clearly competent.    It cannot be doubted, that if the prisoner had declared that he had a slung shot that he was going to put through Denny's head, proof of the threat would have been admissible.    Here he was shown to have been in possession of an instrument which he called a "slung shot," and which he declared, on being inquired of as to the use he intended to make of it, that "it was going through Julius' head."    If this evidence of a malicious purpose to injure Denny was competent at all (and I do not doubt its competency), the production and identification of the instrument by which the threatened personal injury was intended to be effected, was unobjectionable.

In the course of the cross-examination of Mrs. Denny, she was asked: 1st. Whether she was in the habit of having sexual connection with other men than her husband, before

she had it with La Beau? and 2d. Whether it was not her constant habit of having it with four men (naming them) for the past four years? The witness interposed no claim of privilege, but on objection of the district attorney, the court excluded the questions, and the prisoner's counsel alleges this ruling as error, for which the conviction should be reversed. I am of a different opinion. There is no pretense that the inquiries were material or relevant to the issue, but on the contrary, were wholly immaterial and foreign to it. Their exclusion, therefore, was no infringement of a legal right of the prisoner. He could not complain that an objection was sustained to an offer of evidence, wholly irrelevant to the issue being tried. But it is claimed that collateral evidence is allowable from the witness himself, tending to discredit and disgrace him; and that the asking of questions disparaging to the character of a witness, is a matter of right to a party on cross-examination. This is not so. The extent of the cross-examination of a witness upon matters immaterial to the issue, is in the discretion of the judge before whom the trial is conducted. Inquiries on irrelevant topics to discredit the witness, and to what extent a course of irrelevant inquiry may be pursued, are matters, in this State and in England, committed to the sound discretion of the trial court; and this is the rule as regards the right of inquiry into all matters wholly collateral and immaterial to the issue. The court in which the trial is conducted may permit disparaging inquiries on matters irrelevant to the issue, where the ends of justice would seem to demand it, and may exclude them without infringing upon any legal right of the parties; and the exercise of this discretion is not the subject of review, except in cases of plain abuse and injustice. These points were distinctly settled by this court, in the case of the *Great Western Turnpike Co.* v. *Loomis* (32 N. Y., 127). In that case the judgment of the plaintiffs was reversed by the county court, on the ground that the defendant was not permitted, on the cross-examination of the principal witness, to put questions irrelevant to the issue, but tending to degrade the witness; the avowed purpose of the inquiries

being to show that he was unworthy of credit. The questions, as in this case, were excluded as irrelevant, on the objection of the plaintiff, without any claim of privilege by the witness. We affirmed the original judgment, holding that the court in which the cause is tried, in the exercise of its discretion, on objection of the party, without putting the witness to his claim of privilege, may exclude disparaging questions not relevant to the issue on the cross-examination of a witness, though put for the avowed purpose of impairing his general credit; and that decisions of this nature, involving mere questions of practice, order and decorum, are not subject to review on appeal, unless there be a plain abuse of discretion.

In the present case, it cannot be claimed that the prisoner's counsel was unjustly or illiberally restricted in the cross-examination of the witness. Indeed, the utmost latitude was given for irrelevant crimination. Questions calling for answers disparaging to the character of the witness, were permitted to be put and answered, until it appeared from her own statement, and admissions on the witness stand, that her moral character was most disreputable and odious. If the questions excluded had been allowed and answered in the affirmative, it would not have given a deeper stain to it, or have affected, in the least degree, the credit to be given to her testimony, whilst it would have needlessly involved the character of the persons named. For the latter reason, if no other, it was a proper exercise of discretion in the court to exclude the question. It would have been manifest injustice to have permitted the character of those persons to be assailed needlessly without the right, on their part, to speak in their own defense.

I am of the opinion that there was no error committed on the trial, prejudicial to the plaintiff in error, and that the judgment of the Supreme Court should be affirmed.

PECKHAM, J. Three grounds of error are alleged. First. It is insisted that there was no proof to sustain the indictment. The statute made it a felony for any one to administer

or cause and procure to be administered any poison with intent, &c.

The evidence shows that the poison was purchased with prisoner's money, and at his request. It further shows, not directly, but by circumstances quite as conclusive and satisfactory, that he put the poison on the bread and butter prepared for Denny, acting in concert with Denny's wife for that purpose. Denny was a brakeman on a railroad, and was in the habit of taking his dinner with him in a pail each night from his house. This practice was well known to the prisoner and Denny's wife. While both of them were present, this poisoned food was set apart with other food for Denny on a plate, and, on his coming home during the night, was put into his pail as usual by Mrs. Denny. The pail, with the poisoned food, was taken away by Denny, and about noon he partook of it and was poisoned. It is entirely clear, from the evidence, that this was done by the joint arrangement of the prisoner and Mrs. Denny. He had had illicit intercourse with her for some two years, and their design was to take Denny's life. There had been talk of a marriage in that event between the prisoner and Denny's wife. He was a widower, and she twenty-two years old. The prisoner left her room that night about one in the morning, as Denny came in about two, and remaining but a few minutes took off with him the poisoned food. Was this an administering or causing and procuring an administering within the statute? I cannot doubt that it was. The English statute is the same as ours, except instead of causing and procuring to be administered, it says, " or shall cause to be taken by any person, any poison," &c. Under that statute, it was held that putting the poison into the coffee pot with coffee, and telling her mistress she had put the coffee there for her breakfast, and the mistress partook of it, was causing it to be taken.

It was certainly never intended to confine this offense to the manual administering of the poison to a person. So construed, it would be substantially without effect, and would not reach the large class of offenders at whom it was aimed.

The word administer has a far more extended meaning. Webster defines it, among other things, to mean, " to furnish, to give, to administer medicine, to direct and cause it to be taken." As used in this statute, it was obviously intended to cover this whole ground — making it penal to furnish or cause it to be furnished and taken, to give or cause it to be taken. And it embraced and was intended to embrace every mode of giving it or causing it to be taken. A penal statute should be construed according to its plain import, to give it life according to its apparent purpose. In both letter and spirit I think the statute embraces this case.

The evidence very satisfactorily shows that the prisoner prepared this poisoned bread and butter to be taken by Denny. It was laid aside by his paramour, in his presence, with the other food for Denny. Prisoner caused her to put it in his pail, when he arrived to be taken by him, and it was taken accordingly.

The objection as to identifying the slung shot cannot be sustained. It was important to show the intention of the prisoner as to Denny — his murderous purpose. In such case it is not necessarily inadmissible, because it proves an independent crime. This has been repeatedly held.

The question to Mrs. Denny, were you not in the habit of having sexual intercourse with others than your husband before you had connection with the prisoner, was, I think, properly overruled.

This question went back more than two years prior to the commission of this offense, and could have little or no bearing upon the case. It would have added nothing to the depravity of her moral character as already proved, and would have had no tendency to impeach her credibility before the jury more than it was already impeached. Her loose conduct with other men two years before, would have thrown no light upon her purpose and conduct on the occasion in question.

The admissibility of this testimony, and also that offering to show her illicit connection with other named persons, has

been lately held in this court to rest in the discretion of the court at the trial — only to be reviewed for abuse.

It is quite clear that the prisoner has suffered nothing by the rejection of this evidence, and that the discretion of the court at the trial was not abused.

Though I wish to say that, in my opinion, as a general rule, evidence, on cross-examination, tending to impeach the credibility of a witness, should be rejected with very great caution. Its exclusion can rarely be proper.

Judgment affirmed.