(123 App. Div. 174.)

## PEOPLE v. ·FIORI.

(Supreme Court, Appellate Division, Fourth Department. January 8, 1908.)

1. HOMICIDE—MURDER—EVIDENCE.·
Evidence *held* to show that a person accused of murder was not the aggressor in the first instance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, § 507.]

2. CRIMINAL LAW—APPEAL—DISCRETION OF COURT—IMPEACHMENT OF WITNESS.
In a criminal case, the discretion of the court as to admission of evidence on cross-examination to impeach a witness is subject to review.

[Ed.·Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 3064.]

3. WITNESSES—IMPEACHMENT—CHARACTER—DISCRETION OF COURT.
In a murder case, where a witness testified that accused, some time prior to the homicide, while in company with a certain woman, had thrown deceased down and choked him, which occurrence accused denied, evidence was admissible, in the discretion of the court, to impeach the character of the principal witness for the prosecution that he frequently visited houses of ill repute and consorted with low women, especially where the deposition of the woman with accused at the time of the al-·leged assault which was used on a motion for a new trial, and in which she denied that she had ever seen accused, was given little weight on account of her bad character, although the exclusion of such impeaching evidence might not be alone reversible error.

[Ed. Note.—For cases in point, see·Cent. Dig. vol. 50, Witnesses, § 1125.]

4. CRIMINAL LAW—TRIAL—CONDUCT OF COURT—PREJUDICIAL REMARKS.
Remarks of the court intimating that counsel was attempting to tell a witness what answer was desired to a question, and that he was repeating a witness' answer incorrectly, are improper.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1522.]

5. SAME—EVIDENCE—CONFESSIONS—PRELIMINARY EXAMINATION AS TO COMPETENCY.
Where evidence of a confession by accused is offered, the defense is entitled to a preliminary examination of the witness to ascertain its competency.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1216.]

6. SAME—EVIDENCE—EXPERIMENTS—EFFECT OF GUN SHOTS — SIMILARITY OF CONDITIONS.
In a murder case, where a material question was the distance from which shots which killed deceased were fired, evidence of an experiment performed by cutting pieces of cloth from a new garment, moistening them to approximately the same degree as deceased's clothing, and piercing them with the same kind of revolver and cartridges on a day when the atmospheric conditions were similar to those existing at the time of the homicide, was competent as a foundation for an inference as to the distance from which a shot passing through deceased's clothing was fired, but not as to the distance from which a shot was fired which took effect in the head, since to make such evidence admissible the circumstances and conditions must be similar.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 854.]

7. SAME—INFERENCE FROM FAILURE TO CALL WITNESS—INSTRUCTIONS.
In a murder case, where the coroner who was present at the autopsy testified that there was no evidence of powder marks upon the skin around the wound, and physicians who performed the autopsy and who were sworn before the grand jury were not put upon the stand, though

present in court, and a matter in dispute was the nearness of deceased to accused when a second shot was fired as bearing on the question whether it was fired during a struggle, or after it had ended, it was error to refuse to charge that the jury should take into consideration the fact that the physicians were not examined in determining whether or not they would have testified to the contrary, since, while no presumption of law might arise, from the failure to call them, that they would testify contrary to the coroner, it was a circumstance which the jury could consider.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1855.]

8. HOMICIDE—JUSTIFIABLE HOMICIDE—KILLING IN ACTUAL RESISTANCE OF ATTEMPT TO COMMIT FELONY.

Accused, who was attacked in the first instance by deceased and another, testified that they, after demanding his money, and after he had asked to be let alone, grabbed him, threw him to the ground, and, while one of them had his knee on accused's abdomen, demanding his money and choking him so that he was unable to breathe, and the other had hold of his legs, he fired, killing deceased. *Held*, that these facts, if so found by the jury, established that the homicide was justifiable, under Pen. Code § 205, providing that a homicide shall be justifiable when committed in the actual resistance of an attempt to commit a felony upon the slayer, in his presence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, §§ 155–157.]

9. SAME—TRIAL—INSTRUCTIONS.

Under such circumstances, instructions which, after stating the law as to justifiable homicide, add the rule that before a person can justify taking life in self-defense he must show reasonable ground for believing that he was in great peril, that the killing was necessary for his escape, and that no other means were open to him, and that his duty was to avoid the attack by all means within his power, are erroneous, since they leave the jury to speculate upon whether accused had reasonable grounds for believing he was in great peril, while the facts in evidence, if believed, of themselves established not only accused's great peril, but that the homicide was justifiable in law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, §§ 614–632.]

10. SAME—DUTY OF SLAYER BEFORE KILLING IN RESISTANCE OF ATTEMPT TO COMMIT FELONY.

Accused in his position of peril was not called upon to weigh with nicety the question whether an outcry or other means short of taking his assailant's life would prevent the robbery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, §§ 164–167.]

McLennan, P. J., and Spring, J., dissenting.

Appeal from Trial Term, Jefferson County.

Francesco Fiori was convicted of murder in the second degree, and appeals. Reversed, and new trial granted.

The defendant was indicted by a grand jury of Jefferson county at a Trial Term of the Supreme Court, held in and for said county in October, 1905, for the crime of murder in the first degree, for having on the 3d day of September, 1905, at the city of Watertown, in said county, killed one Charles G. Babcock, and, as it is alleged, under such circumstances as to constitute the crime charged. The jury found the defendant guilty of murder in the second degree. This appeal brings up for review the overruling of the defendant's demurrer to the indictment, defendant's challenge to the panel of jurors, the weight of the evidence, the exceptions taken by the defendant as to the ad-

108 N.Y.S.—27

mission and rejection of evidence, and as to the charge and refusal to charge, and also the refusal of the court to grant a new trial upon newly discovered evidence.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

E. R. Wilcox, for appellant.
Fred B. Pitcher, Dist. Atty., for the People.

KRUSE, J. We all agree that the learned trial justice was right in overruling the defendant's demurrer to the indictment, and in refusing to sustain his challenge to the panel of jurors. There is, however, a division among us upon other questions so serious and of such a character as to lead to opposite conclusions in the disposition of this appeal.

The three principal characters who figure in this tragedy, are Francesco Fiori, Charles G. Babcock, and Thomas J. Moulton. Fiori did the shooting. Babcock was killed, and Moulton was present at the shooting, and is the principal witness for the prosecution. Fiori was 17 years of age, an Italian by birth, a common laborer, and had been in this country about three years. Babcock was 20 years old, and Moulton 18. Babcock and Moulton were close and intimate friends, and, as Moulton testifies, drank considerable together; went to places of public resort together, and frequently got drunk together. Upon the night in question Fiori, Babcock, and Moulton were in a saloon, and all three drank more or less. They left the saloon together, about midnight, and the shooting occurred about an hour later. Both Babcock and Moulton seem to have been without money, practically when they left the saloon. Fiori had a $5 bill changed in the saloon, and there was found in his pocketbook after his arrest nearly $10. During all the time they were together, up to just previous to the shooting, there does not seem to have been the slightest disagreement among them. They treated each other, and seem apparently to have been upon the friendliest terms. When they left the saloon they went down Arsenal street and through the public square, a little beyond Factory street, to the railroad shanty. Babcock went into the shanty for the purpose of lighting a cigarette apparently. Then they came back toward Factory street, where they separated; Moulton leaving the defendant and Babcock. It is contended on behalf of the prosecution that the defendant wanted to get rid of Moulton; that he had suggested to Moulton that he had better go home; and that after Moulton left the defendant lured Babcock to a dark place, by a roundabout way, intending to kill him out of revenge for a wrong that Babcock had done him about two months before, and that he accomplished his purpose. The defendant admits the shooting, but contends that Babcock took him to this place, and that Moulton and Babcock attacked him there and attempted to rob him; that what he did was done in defending himself, and was justifiable, or at all events not criminal. Defendant testifies that after leaving the saloon Babcock took hold of his arm on one side, and Moulton on the other; that they went down the street, on the way saying, "You are my friend, you are my friend"; that just before Moulton left them Moulton and Babcock stepped aside and talked;

and that he could not hear what they said. Moulton, upon cross-examination, admitted that he and Babcock may have stepped off three or four steps, but stated that he was unable to recollect whether they had any conversation. The defendant further testified that he said it was late, and he wanted to go home, and Babcock told him to come on. Moulton testified that the defendant said that he (Moulton) had better go home, but would not swear that he did not say that he was going home; that he talked brokenly, and it was hard to understand him. Moulton testified further that, when he left Babcock, he said, "Good night," and started home, going up Factory street, but admits that he did not go home. He says that the defendant and Babcock went back through the public square, down Court street, and stopped in front of the Seymour house at the corner of Court and Massey streets, going a distance of about a half a mile; that he followed them, and was about 40 feet behind them all the way to where they stopped, when he went by apparently unobserved by them; that he intended to get by without being seen. A policeman testified that he saw the three, and that Babcock was intoxicated, but the other two were not. Moulton passed on to the railroad track. He looked around to see if they were coming, and saw them coming toward him. He continued on across the railroad track, over the bridge across the river, to Main street; Babcock and the defendant following him. They turned into Main street, and Moulton hid behind a tree, where it was dark, near a drug store; Babcock and the defendant passing on ahead of him. It is not contended that the defendant knew that Moulton was following, or ahead of or near them, and Moulton disclaims that there was any understanding between him and Babcock that he should follow, or any signaling between them when he was ahead, and the defendant and Babcock were behind. He insists that neither the defendant nor Babcock knew that he was near them until they reached the vicinity of the place where the homicide occurred, and to which attention will now be called. After the two passed the tree where Moulton was hiding, he followed along behind them, on Main street, to Moulton street, a distance of about 500 or 600 feet. He heard Babcock saying to the defendant, "You are a friend of mine." There was no quarrel or contention, no unpleasantness. He saw them go down Moulton street, a distance of about 100 feet or a little more, to a bend by the telegraph pole, where they stopped. He says that, when they turned down Moulton street, they were about 30 feet ahead of him; that he continued to walk up to them until he arrived about 3 feet from them; that there was no quarrel or loud talk until they stopped; that he then heard Babcock say to the defendant, "You have been following me for my money"; that he walked up to them, and said, "Here, here, what's this? What's the matter with you fellows?" and that when he said that the defendant ran out into the middle of the road, and up the street, and stopped; that at that time he (Moulton) was standing down by the side of the telegraph pole; that Babcock stepped off the walk; that just as the defendant stopped Babcock started, and said, "Don't think I am afraid of you"; that the Italian kept running back, and when they met each other they clinched; that the Italian had something in his hand; that, as Babcock stepped off the walk, he went up the street

on a kind of a run; that he staggered; that, as the Italian ran back and they came together, they clinched; that he stepped beside the telegraph pole when he saw them running, and stood there when they clinched; that they were just about half bent over when he heard a shot; that he jumped behind the pole for a few seconds, looked again, and saw the defendant running; that he saw Babcock lying there on the ground; that he stayed behind the pole until the Italian was gone, and then halloed to Babcock, and there was no answer; that he kept halloing, calling him by name, "Charlie," but there was no response.

Upon cross-examination he stated:

"When I hear Charlie say something about money, I walks up to them and I says: 'Here, what's this about? What's the matter with yous fellows?' or something like that.

"Q. Whom did you say that to, Charlie and the Italian both? A. Yes, sir.

"Q. They weren't quarreling then, were they? A. No, sir.

"Q. Didn't have their hands on each other? A. No, sir. * * * And when I made the remark, 'What's this? What's this?' they both turned around. and saw me. They must have seen me.

"Q. And then what was the next thing that occurred after the Italian and Charlie turned around and saw you? Was anything more said? A. No, sir. The Italian ran out into the road."

That Babcock chased him, following close behind the defendant. That the shot was fired when they clinched. That the defendant ran into the road toward the light. That it was quite dark down by the telegraph pole. He admitted that at that time he (Moulton) did not have a cent and Babcock had but five cents.

What occurred, according to the defendant's testimony, may be best stated in his own words. He testified:

"As soon as we got here in the dark spot, I met Moulton over there, and I got scared when I saw him. I was scared and said: 'Why this one is here? Why should he be here? He is going to kill me now.' As soon as I saw Moulton here, I was scared. Moulton says to him: 'He's got money. He's got money.' Charlie said to me: 'I want your money.' I said to him: 'Leave me alone, leave me alone. I want to go home.' I made four or five or six steps to return this way, and when I was going this way I saw Moulton grabbing me, and I stepped in this way, and turned back. [Witness illustrates.] I returned back because I saw Moulton coming that way. Charlie grabbed me by the legs in this way, and threw me on the ground this way, and grabbed me by the neck and had his knee on my abdomen, and Moulton grabbed me by the feet. He says: 'Give me your money, give me your money, son of a bitch. I want to kill you.' I couldn't breathe because he grabbed me strongly on my neck. I was doing this way [illustrating], and my eyes were sticking out. I did this way, and I went this way, and I shot in the air to scare them out. I shot this way, just like this [indicating]. When I shot the first time, they wouldn't let me go. Both of them got up when I shot the other one in the air. Then they let me go. They both disappeared, and I did this way [illustrating], and ran away. I ran down home when I ran away."

After his arrest on the night of the shooting, the defendant denied that he did the shooting, and also claimed, after being taken into custody, that there was a fourth person present who did the shooting, but upon the trial he admitted that he himself did it, as has been stated.

Moulton testified that he heard but one shot fired, but all the other witnesses who heard the shooting say that there were two fired in quick succession, and there is no doubt that two shots were fired, since there were two gun shot wounds, one just back of and below the left

armpit, and another in the back of the head, about midway between, the tip of the mastoid process and the point of bone which forms a prominence at the back of the skull, or, as one witness puts it, right at the left ear, below or about the base of the brain. The bullet making the first wound passed entirely through the body, and the bullet causing the second wound was found about the center of the skull; its course having been upward at an angle of about 32 degrees, instead of downward, as the coroner at first testified.

Mrs. Oakes, who had rooms upstairs in the block in front of which the shooting occurred, says she noticed two men come down the street, and that she saw one man turn and go up toward Main street, and then come back; that she did not know what the other did; that she heard two shots; did not see who did the shooting; and that she got back from the window just as he started to run. She was unable to describe the man whom she saw running. She was asked the question whether the man whom she saw running at last across the street, and down Main street, was the same man whom she had seen go up Main street, and she replied that she could not tell. Being further questioned upon the same subject, she said she could not tell for certain; that it looked like the same one, and upon being further pressed, and asked to give her impression, she said that she thought it was the same one. She further stated that she did not see any other person come down the walk after the two, and that she did not hear any such exclamations as Moulton testified he made, and that she was rocking her child.

Other witnesses who lived in the neighborhood, and heard the shooting, called by the prosecution, stated that they heard no halloing or calling the name "Charlie." One of them, a Mr. Welch, who resides on the corner of Moulton and Main streets, testified that what first attracted his attention was hearing the words, "Throw it, throw it"; that he judged it was an English voice. He heard no one call names, or shout. Mr. Leffingwell, who also lives on the corner of Main and Moulton streets, in this same block, testified that he was awakened by hearing some talking; that he heard some one say, "Leave me alone," or "Go home"; that that was all the words he could catch; that it was not plain English; that all he heard of the conversation that he could remember, was "Leave me alone" or "Go home"; that he heard the word "home" quite distinctly, and that it was in broken English; that he heard no one say or yell "Charlie" in a loud voice. Moulton testified that he screamed out, and made a loud scream, calling the name "Charlie." Moulton himself testified that the defendant could not talk English very well; that he had some difficulty in understanding him; that his language was broken, and proof of the same character appears by the testimony of other witnesses who heard the defendant talk, and it is also quite evident from defendant having given his testimony through an interpreter.

Without further detailing the testimony as to what transpired at the time of the shooting, and prior thereto, it may be stated generally that the proof fairly shows that the defendant was not the aggressor in the first instance, and it may well be that the defendant was attacked by Moulton and Babcock, and that they attempted to rob him,

as he claims, nor is it at all certain that the jury would have found the defendant guilty of the crime of which he was convicted, except for the evidence to which attention will now be called. Miles Sedore, a resident of Canada, and a friend of Babcock, came voluntarily into this state at the request of the district attorney, attended the trial, and testified that he was at Watertown for four or five days in July, 1905; that on the 4th of July, which was about two months before the shooting, he saw the defendant with Emily Olney, whom the witness characterized as Charlie Babcock's girl; that Babcock followed and stepped up between them, and threw the defendant to the ground, and choked him; that he (the witness) pulled Babcock off, defendant ran away, and Babcock followed with the girl; that he and Babcock went to Syracuse that night, and finally arrived at Napanee, Canada, where he (Sedore) resided, the 17th or 18th of August. This occurred about midnight, and witness admitted that he had never seen the defendant before, nor since that time until he saw him in court; that he and Babcock were drunk together at different times; that Babcock was drunk upon this occasion, but he, the witness, was not, although, as he puts it, "feeling pretty good." The circumstances to which the witness testified as having occurred on the night of the 4th of July were important, if true, not only upon the question of motive and the degree of crime, if any, was committed by the defendant, but also upon the question as to whether the shooting was criminal at all. This witness was the last witness called for the people on its case. He was not sworn before the grand jury, and the defendant's counsel claims that he was taken wholly by surprise, and unable to adequately meet this testimony upon the trial. The defendant himself testified that no such occurrence as was sworn to by Sedore ever occurred; that he never was in the city of Watertown before August, 1905; that he never saw Babcock before the night of the shooting, and never knew Moulton before that time; that he never walked with this girl, Emily Olney, or ever knew her; that he was working in Philadelphia, N. Y., on July 4th, and called witnesses whose testimony tended to corroborate him. It seems that the girl, Emily Olney, was at that time confined in the New York State Training School for girls, at Hudson, so her testimony was not available upon the day of the trial. Subsequently her evidence was taken and used on the motion for the new trial; and she testified that she knew Babcock, but the last she saw him was on the afternoon of July 4, 1905; that she never knew the defendant, and never was out walking with him, and that no such occurrence as Sedore testified to ever happened. A motion for a new trial was made, based upon her testimony, and also upon the further ground of other newly discovered evidence, tending to show that Babcock and Moulton made a statement on the evening of the shooting, and before they left the saloon, that the defendant had money; the particular statement which the witness testifies he overheard being that Babcock or Moulton said, one to the other, "He's got a roll on him, all right," it being claimed that the statement had reference to the defendant. The motion was opposed by the district attorney, the affidavits read in opposition thereto being largely directed to the question of the credibility of the witnesses by whom it was proposed to contradict the evidence of Sedore,

and establish the statements referred to made by Moulton and Babcock. The motion was denied upon the ground that the evidence was cumulative, and probably would not change the verdict; the court saying, as regards Emily Olney, who seems to have been a lewd woman, that her character was such that little weight should be given to anything she might say. Counsel for the defendant contends that the motion should have been granted, and also urges as grounds for reversal exceptions to the charge, and to the rulings upon questions of evidence, and remarks of the trial court during the trial, which he contends were highly prejudicial to the defendant. Some of them are without merit, and we need not discuss them. There are others which require some attention.

The witness Moulton was asked whether he frequently went down on River street. The question was objected to, and the objection was sustained, to which the defendant excepted. Witness was then asked this question:

"Q. You have visited very frequently houses of ill repute? (Same objection.)

"The Court: I think you ought to be able to understand my ruling. If you cannot understand it, I will have to state it in such a manner that you won't forget it.

"Mr. Wilcox: I do understand it; but I thought you threw out the question because it was not proved before the court that River street was a street having on it houses of ill repute. I think I have a right to show that he frequently visits houses of ill repute and consorts with low women to affect character; that is all. I understood, of course, the ruling—

"The Court: The objection is sustained. (Exception for defendant.)"

We think the question was proper (People v. Giblin, 115 N. Y. 196, 199, 21 N. E. 1062, 4 L. R. A. 757; People v. Webster, 139 N. Y. 73, 84, 34 N. E. 730; Underhill on Criminal Evidence, § 254), although it was discretionary with the trial court to permit the answer to be given (La Beau v. People, 34 N. Y. 223; People v. Braun, 158 N. Y. 558, 53 N. E. 529). Such discretion, however, is subject to review in this court. People v. Dorthy, 156 N. Y. 237, 244, 50 N. E. 800. While we do not hold that this ruling alone requires the granting of a new trial, we think the trial court might well have permitted the answer to be given. The fact that Emily Olney was a dissolute character seems to have had weight in determining her credibility, and, if Moulton had answered the question in the affirmative, it was a proper circumstance to be considered, with others, in connection with the credibility to be given to his testimony. Judge Peckham, in the La Beau Case, while agreeing that it was not an abuse of discretion in that case to reject the evidence, says, as a general rule, evidence on cross-examination tending to impeach the credibility of a witness should be rejected with very great caution. Its exclusion can rarely be proper. Of course, cross-examination may be carried along this line beyond reasonable limits, but as the question was here presented, and under the circumstances of this case, we think the question was not subject to this criticism.

Counsel for the defendant also claims that remarks prejudicial to defendant were made by the trial court, calling attention to what the trial court said when ruling upon the question last referred to, and

other remarks made during the course of the trial, among others, the following, which occurred upon the cross-examination of the witness Sedore, upon the subject of his ability to identify the defendant:

"Q. To be perfectly honest about it, you cannot describe a feature of this defendant, can you? A. No; not to be positive.

"Q. And you couldn't that night either, could you? A. I didn't take any particular pains to.

"Q. You didn't take any particular notice of the man, did you? A. Well, I knew him—

"Q. No, sir.

"Mr. Pitcher: I object to the counsel repeating what he claims is the answer of the witness. The answer was not, 'No, sir.'

"The Court: I suppose the counsel states what he would like to have for an answer.

"Mr. Wilcox: I object to that remark.

"The Court: In the first place, the rules of the Supreme Court forbid repeating at all the answer of the witness; and, in the next place, if you do undertake to repeat, you ought to repeat it with reasonable faithfulness.

"Mr. Wilcox: I mean to. I don't wish any insinuation cast on me that I want to be unfair at all.

"The Court: Omit attempting to repeat, and then you won't make any mistake."

If there was sufficient to justify the remark excepted to, it is not disclosed by the record; and it may have been prejudicial to the defendant. 12 Cyc. Law & Procedure, 538.

It is also contended on defendant's behalf that evidence of his confessions was improperly received over the defendant's objection and exception. The evidence of what the defendant said was given by a policeman; the statements being made in the presence of himself and other policemen after the defendant was under arrest and in the custody of the police officers. That fact appearing, the defendant's counsel objected, and asked to examine the witness preliminarily, which was refused; the court saying:

"You can cross-examine later on, and, if it turns out that the statement was elicited under such circumstances as would make it incompetent, you can strike it out"

—to which ruling defendant's counsel excepted. We think counsel was entitled to the preliminary examination. People v. Fox, 121 N. Y. 449, 24 N. E. 923; People v. White, 176 N. Y. 331, 350, 68 N. E. 630; Woodworth v. Brooklyn Elevated R. R. Company, 22 App. Div. 501, 48 N. Y. Supp. 80.

Certain experimental evidence was admitted against objection and exception of the defendant. One of the police officers cut pieces of cloth from a new garment, and penetrated the same with bullets fired from a revolver. He took a brushbroom, and moistened it through, as he says, to the extent to which he judged Babcock's coat was wet. The tests were made at distances varying from 1 to 48 inches, and the part of the fabric immediately surrounding the hole was cut from the garment, and afterwards subjected to microscopical and chemical examination by an expert, and was found to contain powder. The expert admitted that the kind and condition of the powder would make a difference in the combustion, and the condition of the atmosphere would make a great difference. It is undoubtedly true that evidence of this

character is admissible, and very commonly resorted to, but the circumstances and conditions must be similar. The rule is thus stated in the American and English Encyclopædia of Law (12 Am. & Eng. Ency. [2d Ed.] 406):

"Where a party seeks to show by evidence of experiments that an alleged result would or would not follow from the conditions proven, the experiments, evidence of which is sought to be introduced, must have been made under circumstances and conditions similar to those constituting, as it were, the premises from which the original event is alleged to have been the conclusion. Thus, where a material question was the distance between the muzzle of the gun and the body of the victim of an alleged murderous design, evidence was excluded of the result of experiments as to powder marks made upon pasteboard targets by firing a gun at varying distances upon the ground that the human body is fundamentally different in nature and texture from the substance upon which the experiments were made."

It is true that the conditions were sought to be met with reference to the revolver and cartridges by using the same kind as those used by the defendant, and it was also attempted to comply with the conditions regarding the atmosphere, for the test seems to have been made on a rainy day; it appearing that it was wet and rainy the night when the homicide was committed. And so it was also sought to bring it within the conditions of Babcock's clothing. It appeared in addition that the portion of Babcock's coat which the bullet penetrated contained powder, and the lapel appeared to be burned or scorched. The learned trial judge referred to these experiments made by the officer, permitting the jury to infer from the evidence that the fatal shot which penetrated the head was fired when the muzzle of the revolver was more than 48 inches from the head. We think that if the evidence of the tests made by the police officer, and the result thereof, had been limited to the first wound (that which pierced the garment and body below the armpit), it would not have been harmful. The defendant himself claimed that Babcock was near him when the first shot was fired, and perhaps the conditions were sufficiently similar to admit the experimental evidence to that extent. But it went beyond that, and made a comparison with the tissues of the head where the bullet penetrated. We think it injected into the case an element of dissimilarity, which, instead of aiding the jury, would be quite liable to confuse them, as was said in the case of State v. Justus, 11 Or. 178, 8 Pac. 337, 50 Am. Rep. 470, where the court refused to receive experiments made by shooting at pasteboard targets; the court saying:

"Where such evidence has been held as admissible, the experiments were made with like means on the same kind of stuff or substance, or were based on a similarity of conditions or circumstances whereby the results produced betray with some certainty and uniformity a common similitude or agreement, and as a consequence thereof furnish a safe foundation for inference or the truth of the matter sought to be established."

We think the evidence, as applied, was not within the rule requiring similarity of conditions to make evidence of that character competent.

There were also several exceptions to the charge. The coroner, who was present at the post mortem, testified that there was no evidence of powder marks upon the skin, or of the ear being burned

around the wound on the head. It seems that the two physicians who performed the autopsy, and were sworn before the grand jury, were present in court, but not put upon the stand by the district attorney. The trial judge was requested to charge that that fact should be taken into consideration by the jury in determining whether or not they would have testified to the contrary. The request was declined and excepted to. The nearness of the deceased to the defendant, at the time the second shot was fired was in dispute, at least so it is claimed by the district attorney. The defendant insisted that the second shot was fired at the time of the struggle, and Moulton does not testify to the contrary. So far as that fact was put in dispute at all, it was by the lack of powder marks and other circumstances from which the district attorney seeks to have the inference drawn that the struggle had ended, and that Babcock was some distance away when the fatal shot was fired. We think that, under the circumstances, the defendant was entitled to this charge. Sugarman v. Brengel, 68 App. Div. 377, 74 N. Y. Supp. 167; Kirkpatrick v. Allemannia Fire Insurance Company, 102 App. Div. 327, 92 N. Y. Supp. 466, affirmed in 184 N. Y. 546, 76 N. E. 1098; People v. Smith, 113 App. Div. 396, 99 N. Y. Supp. 118. Of course, either party could have called them, and very likely no presumption would arise as a matter of law from the failure upon the part of the district attorney to do so that their testimony would be contrary to that of the coroner. But it was a circumstance which the defendant's counsel, I think, had the right to comment upon, and, if so, it was a proper circumstance for the jury to consider. The jury might well have found that their testimony would be less favorable to the people.

The trial judge read to the jury section 205 of the Penal Code, relating to justifiable homicide, charging them that, if they found the case to be one of justifiable homicide, their verdict must be for the defendant, saying in that connection:.

"The rule with reference to that, in addition to the statute to which I have called your attention, has been laid down by the Court of Appeals of this state in the following language: 'Before a party can justify the taking of life in self-defense, he must show that there was a reasonable ground for believing that he was in great peril, that the killing was necessary for his escape, and that no other safe means was open to him. When one believes himself about to be attacked by another, and to receive great bodily injury, it is his duty to avoid the attack, if in his power to do so, and the rights of attack for the purpose of self-defense does not arise until he has done everything in his power to avoid its necessity.'"

Under the first subdivision of that section, the defendant had the right to kill Babcock in the lawful defense of himself, if there was reasonable ground to apprehend a design upon Babcock's part to commit a felony, or to do him some great personal injury, and there was imminent danger of such design being accomplished. Under the second subdivision such a homicide was also justifiable in the actual resistance of an attempt to commit a felony upon the defendant. The entire subdivision reads:

"(2) In the actual resistance of an attempt to commit a felony upon the slayer, in his presence, or upon or in a dwelling or other place of abode in which he is."

The undisputed evidence shows that the defendant was attacked in the first instance. The defendant also testified that both Babcock and Moulton, after demanding his money, and he had asked to be let alone, and to go home, grabbed him; threw him to the ground; that Babcock had his knee on his abdomen, demanding his money; and that he was unable to breathe, and he then shot. Counsel for the defendant requested the court to charge that, if the jury find that Babcock at the time the fatal shot was fired was actually trying to rob the defendant of his money, they must find a verdict of not guilty, and acquit the defendant, to which the court replied:

"That I charge, calling attention again to what I read from the Court of Appeals."

Similar requests, embodying the facts in substance as the defendant claimed them to be, were made, and the same reply given to each of them, counsel for the defendant also calling attention to the fact that he did not claim that the shooting was justifiable in self-defense, under section 26 of the Penal Code, but that it was justifiable under the provisions of section 205. Exceptions were taken to the charge as made, and particularly to the refusal to charge the requests, and to the qualifications made by reading the excerpts from the Court of Appeals decisions. Blackstone in his Commentaries (4 Bl. Com. 180), after stating that homicide committed for the prevention of any forcible and atrocious crime, is justifiable by the law of nature, and also by the law of England, says that if any person attempts the robbery or murder of another, and should be killed in such attempt, the slayer should be acquitted and discharged; and then points out the distinction between such a homicide, and homicide in self-defense, or se defendendo upon a sudden affray, saying that the latter is also excusable rather than justifiable by the English law, and that such a species of self-defense must be distinguished from that calculated to hinder the perpetration of a capital crime, which is not only a matter of excuse, but of justification; that to excuse homicide by a plea of self-defense in such a case it must appear that the slayer had no other possible, or at least probable, means of escaping from his assailant. This same distinction is made by Bishop, in his work on Criminal Law. Bishop on Criminal Law, §§ 840, 841, 849, 867. And so it was early provided by statute and incorporated in the Revised Statutes of this state that homicide should be justifiable when committed by a person when resisting an attempt to murder him or to commit any felony upon him (2 Rev. St. p. 660, § 3, subd. 1), although it was also provided that a person who unnecessarily kills another while resisting an attempt of such other person to commit a felony, or to do any other unlawful act, should be deemed guilty of manslaughter in the second degree (2 Rev. St. p. 661, § 11). We think this same distinction is carried into the provisions of the Penal Code as is manifest from a reading of subdivisions 1 and 2 of section 205. We need not now point out to what extent the rules of the common law have been changed by statute, nor do we say that the statements read from the opinions in the Court of Appeals may not apply to this case. But if the defendant was thrown to the ground, and Babcock and Moulton were actually robbing him,

as he claims, he had the right to resist being robbed, and to use whatever means lay within his power necessary to that end; and, if the facts were as the defendant claimed them to be, and embodied in these various requests, and the jury so found them, they established not only that the defendant was in great peril, as that term is used by the Court of Appeals, but that the homicide was justifiable in law, as declared and applied in the decisions of the Court of Appeals; and the jury should not have been left to speculate upon the question as to whether the defendant had reasonable grounds for believing that he was in great peril, if they found these facts. The jury might well get the impression that the defendant having but $10 upon his person was not in great peril, and that the killing was not necessary; that he should rather have submitted to being robbed than take the life of the person robbing him. Judge Allen, in Ruloff v. People, 45 N. Y. 213–220), commenting upon the provision contained in the Revised Statutes making a person who unnecessarily kills another, under such circumstances, guilty of manslaughter, says:

"Without undertaking to define the boundary line which separates the lawful and authorized from the unauthorized and illegal acts of individuals in the protection of property, the prevention of crime, and the arrest of the offenders, it is enough that the law will not be astute in searching for such a line of demarcation as will take the innocent citizen, whose property and person are in danger, from the protection of the law, and place his life at the mercy and discretion of the admitted felon. They will not be made to change places upon any doubtful or uncertain state of facts."

And it may be suggested here that if the defendant was thrown to the ground, being robbed by Moulton and Babcock as he claims, one having hold of his legs, the other on his abdomen, choking him, demanding his money, the defendant ought not, in the actual resistance thereof, be called upon to weigh with nicety the question whether an outcry or other means short of taking the life of the person robbing him would answer the purpose of preventing the robbery. He was not only in great peril, but he had a right to do whatever was necessary to prevent being robbed, even to the extent of killing his assailant.

The judgment of conviction should be reversed, and a new trial granted.

Judgment and orders reversed and new trial ordered. All concur, except McLENNAN, P. J., and SPRING, J., who dissent upon the ground that the evidence fairly establishes the guilt of the defendant, and that there were no prejudicial errors committed.