## Nancy McGinnis and others v. Mary Kempsey.

*Witnesses: Quarrels with party: Discretion.* The latitude to be allowed in collateral inquiries as to difficulties between a witness and one of the parties is a question resting somewhat upon the discretion of the trial court; and a court of review will not reverse a judgment for the exclusion of such inquiries, unless a clear abuse of discretion is made to appear.

*Wills: Mental capacity: Reputation of executor named: Evidence.* In a will case where the will is contested on the ground of want of capacity, evidence of bad reputation of the person named as executor is competent when accompanied with a showing of circumstances sufficient to justify an inference that the testator knew at the date of the will that his character was bad.

*Wills: Mental capacity: Evidence.* It is competent for contestants of a will to inquire as to the capacity of the testator at the time, to plan and execute such a paper as the will proposed.—*Kempsey v. McGinnis, 21 Mich., 123,* approved.

*Evidence.* The propriety of a question is not necessarily to be settled by considering it as a substantive and independent inquiry, but the preceding course of examination and the surrounding circumstances will be taken into account; and where, during a long and minute examination and cross-examination, the opinion of a medical expert as to the capacity of the alleged testator has been elicited upon groups of assumed facts, by carefully framed hypothetical questions, without each time repeating the facts assumed, a question on re-examination which did not include the hypothesis, is treated and considered as resting upon the hypothesis pointed at by the cross-examination.

*Evidence.* Where the person who drew the proposed will has testified as a witness for proponents, that on an occasion about a year before he drew the will he made a memorandum of a land trade between the testator and another, and that on the day of executing the will the testator called his attention to it, the exclusion of an inquiry by proponents as to what recollection he had upon the subject himself is not error; the question was immaterial; the recollection of the testator, and not of the witness, was the only thing of importance connected with the circumstance.

*Wills: Charge to the jury: Presumption of sanity: Evidence.* It is not error to decline to charge that, "If the jury should find that upon *the other testimony* relating to the testator's mental soundness, the evidence was balanced, they should allow the legal presumption of sanity to decide the question in the testator's favor;" the burden of proof is on the proponents of a will, to establish capacity by other evidence than the presumption of sanity, and that presumption can not have the force of an independent fact to serve as a substantial make-weight against counter proof.

*Testamentary capacity.* Upon the subject of testamentary capacity and the intent and free action essential to the validity of a will, *Kempsey v. McGinnis, 21 Mich., 123,* is cited and approved.

·*Charge to the jury.* A charge to the jury is to be considered together as a whole; and if an erroneous statement in one part of it, is so naturally and intimately connected in sense with others explanatory thereof, as to be understood by the jury as intended to be considered together, and as relating to the same point, and the charge considered as a whole is in substantial compliance with the requests of the party complaining of such error, his objection will not be sustained.

*Wills: Publication.* Whether it is necessary to the validity of a will executed in this state, that the testator should declare it to be his last will:—*Quære ?*

*Heard May 9 and 13.    Decided July 11.*

Error to Kalamazoo Circuit.

This is an appeal to the court below, from the order of the probate court, allowing the will of Thomas Patterson. The will was proposed by Nancy McGinnis, James McGinnis, Henry McGinnis, John McGinnis, Sarah Wiswell, Mary A. Payne, named as devisees in the will, and Botman Fitzsimmons, named as executor; and was contested by Mary Kempsey. The case was tried in the court below by jury, who found for the contestant, and the proponents bring the case here on writ of error.

The question put to Dr. Mottram, which is referred to in the opinion, was, whether, in his opinion, assuming the facts stated as to the condition of the deceased, he was capable of planning and executing, at the time specified, such a paper as the one offered as his will. This was explained to mean the mental process of originating the propositions of the will, considering them relatively, and of planning and executing the instrument proposed.

The contestant's seventeenth request to charge, referred to in the opinion, was as follows:

"17. That the will in question in this case is not valid unless the testator, Thomas Patterson, not only intended of his own free will to make such a disposition of his property as is made by such will, but was also capable of knowing what he was doing, of understanding to whom he was giving his property, and in what proportions, and whom he

was depriving of it as heirs who would otherwise have inherited his estate; and was also capable of understanding the reasons for giving or withholding his bounty as to them."

The court also instructed the jury on the subject of mental capacity, besides reading to them what is contained upon it in the decision of this case in *21 Mich., 123,* as follows:

"Aside from the requisite formalities in the making of a will, the law defines the requisite soundness or mental capacity of the testator in this wise: A will is not valid unless the testator not only intends, of his own free will, to make such a disposition, but is capable of knowing what he is doing, of understanding to whom he gives his property, and in what proportions, and whom he is depriving of it as heirs, or as devisees under the will he makes.

"If a testator has mind enough to know and appreciate his relations to the natural objects of his bounty, and the character and the effect of the dispositions of his will, then he has mind sufficiently sound to enable him to make a valid will.

"If the jury should be satisfied that though the testator's mental powers had become enfeebled through mental decay or disease, he still had disposing mind, and if you find the evidence sufficient to show that he fully understood and intended to make the disposition which he has made of his property, then the will must stand, as touching the question of mental capacity or soundness, however unnatural or unjust its provisions may appear. Such are the tests the law prescribes for the guidance of courts and juries.

"The term, 'sound mind,' in the statute, does not mean that the testator shall have the same command of his mental faculties that he may have when in health. The law, recognizing that wills are often made *in extremis,* when the bodily powers are breaking, and the mental faculties are enfeebled, only requires that the testator shall retain so

much of his mental power as will enable him to understand his relations to those who would be the natural objects of his bounty, the property he wished to distribute, and the manner in which he intends to distribute it.

"Upon this question I advise you, as requested by proponents' counsel: That even if the jury are satisfied that the mental powers of Patterson had become enfeebled or disturbed by disease at the time he made the alleged will, still if they find from the evidence that he did yet fully understand and intend to make the disposition which he made of his property, then the will must stand, as touching the question of mental soundness or capacity.

"You are instructed 'that if in the present case you should find from the evidence that Patterson, on the day he made the alleged will, was delirious, or that his mental faculties were otherwise obscured by the disease from which he was suffering, still this would not necessarily prevent his having sufficient capacity in law to make a will. Delirium or obscuration of the mental faculties by disease, must be so complete and so becloud the mind, that the testator does not understand the nature of the business in which he is engaged,' or does not understand at the time of making the instrument, substantially the act, the extent of his property, his relations to others who might or ought to be the objects of his bounty, and the scope and bearing of the provisions of the will, and does not possess the other qualifications I have already referred to.

"The impairing of the mental faculties by the effects of acute disease, such as delirium, or the enfeebling of them from any of the causes incident to such disease, must be to that extent which deprives him of the use of his reason and understanding to the extent already intimated. For if this is not the testator's situation, although his understanding may be to some extent obscured, and his memory troubled, yet he may make his will.

"There is an essential difference between the apparently lucid interval in delirium and in general insanity. In

delirium the apparent returns to reason may be real and unquestionable, while those which seem to occur in insanity are delusive, the patient being as really laboring under the power of the malady as in the more distinctly marked periods of its progress; but testamentary incapacity does not necessarily pre-suppose the existence of insanity, in its technical sense. Weakness of intellect, whether arising from extreme old age, from disease or great bodily infirmity, from intemperance, or from all these causes combined, when such weakness disqualifies the testator from knowing or appreciating the nature, effect or consequences of the act he is engaged in, renders such testator incapable of making a valid will.

"The law requires that a person, in order to make a valid will, should be of sound and disposing mind and memory. And what we mean by soundness in this connection is, not that the mind should be in its full vigor and power, but that its faculties, its machinery, should be in working order, so to speak, with an active power to collect and retain the elements of the business to be performed, for a sufficient time to perceive their obvious relation to each other.

"From these considerations you will perceive that the testator must have intended of his own free will to make such a disposition of his property as is made by his will, and must have been capable of knowing what he was doing, of understanding to whom he was giving his property, and in what proportions, and whom he was cutting off from it as heirs who would otherwise have inherited his estate; and was also capable of understanding the reasons for giving or withholding his bounty as to any of them. In short, the testator, at the time of making the will, must have been capable of exercising his judgment, his reasoning faculties and a consecutive continuation of thought.

"In determining the question of mental capacity, a wide range is always permitted. The jury may look at the provisions of the will, may consider the history and relations

of testator, his previous conduct and language in relation to those related to, or acquainted with him, and his previous determination as expressed by him as to what disposition he intended to make of his property, as well as the testimony of witnesses who swear to his actual mental condition as witnessed by them at the time of executing the will.   If a party makes a will contrary to natural justice, this with other facts may be considered.   But the mere fact that a will is not exactly according to what our own conceptions of justice would be, is not, of itself, sufficient to invalidate a will, for the reason that sane men are known to disagree in this respet.   By 'natural justice,' we mean that which is founded in equity, in honesty and right.   Natural justice requires that the parent shall care for his children.   By bringing them into the world, the parent engages to provide for them.   Natural justice requires that the child who has been protected in the weakness of his infancy, should protect and support that parent in the infirmity of his age.   There are other relations in the history of every individual out of which obligations grow, but which are so varied and embrace so wide a range that human tribunals cannot and do not attempt to enforce them. And wherever the question is presented as to whether a natural obligation has been created, it can only be by inquiring what honor or conscience dictates.   But in determining a case like this, what conscience dictates, we are not to consider alone the fact that this person or that person is a blood relation of the testator.   Even under the civil law, where a parent was not allowed to disinherit his child without giving his reasons therefor,—and the law recognized fourteen reasons, either one of which was deemed sufficient to absolve the parent from what, without such reason would be deemed an obligation founded on natural justice; in short, the conduct of the child towards the parent was to be considered in determining the question as to whether natural justice required the parent to confer any portion of his property upon the child.   Did the child refuse to aid

the father and to give him his services, and did he refuse to reverence his authority, natural justice did not require the father to treat the child in disposing of his property, any different from strangers.

"I have been requested and so advise you: That there is a legal presumption raised by the law in favor of the sanity of all men, and although this presumption is not conclusive, still the jury should consider it in weighing the evidence in the case, of which for practical purposes it forms a part."

The above extract from the charge also embraces that portion of it upon the subject of natural justice to which objection is taken.

*William Fletcher, H. F. Severens* and *D. Darwin Hughes,* for plaintiffs in error.

*Edwards & Sherwood* and *G. V. N. Lothrop,* for defendant in error.

GRAVES, J.

Since our judgment in this case as reported in *21 Mich., 123,* a second trial has been had, resulting in a verdict against the validity of the instrument propounded as the last will and testament of Thomas Patterson, deceased, and the cause is again brought here to obtain a revision of certain rulings upon that trial.

Several errors are assigned in the record, but only those will be noticed which were insisted on at the hearing.

The first point is upon the exclusion of a question put by proponents on cross-examination, to the witness Echardt. This witness had testified at much length relative to decedent's malady, condition and conduct, and the intercourse between members of the McGinnis family and decedent. On cross-examination he referred to his being at decedent's place, and there visiting with the widow of John McGinnis, and stated that he was at that time paying some attention to her. He afterwards, and before his examination, married

her.    He also stated in the same connection that he went
from decedent's place to that of Thomas McGinnis, and that
the occasion of his leaving was some little trouble with
Henry McGinnis.    In answer to specific questions he
further stated that he had some difficulty with Henry
McGinnis, which was the occasion of his leaving Patterson's.

He was then asked what this difficulty was about, and
in support and explanation of the question it was stated by
proponents' counsel that they expected to show that the
difficulty alluded to grew out of an alleged impropriety on
the part of the witness and the widow McGinnis, and that
it was expected to follow this up by showing that the wit-
ness was expelled from the place.    Upon objection the
question was excluded.    This ruling must be viewed in
connection with the offer and explanation made by propo-
nents' counsel, and so regarded, it was not improper.    The
material circumstance for the jury to know, namely: that
difficulty had arisen between the witness and a member of
the McGinnis family, had been elicited, and it was pressing
the privilege of cross-examination to questionable limits
when it was proposed to trace the cause of the bad feeling
to something improper in the association between the wit-
ness and the woman who had become his wife.    It is
quite impossible to avoid the opinion that something more
was involved than evidence of bad feeling likely to cause
bias in the witness.    We do not intend to intimate that
counsel meant to go beyond this, but it appears very clear
to us that the question and explanation was mainly, if not
exclusively, suited to fix a stain upon the character of the
witness, if not upon that of his wife.    There is much
diversity of opinion respecting the latitude to be allowed
in collateral inquiries of this kind, and some discretion cer-
tainly must be allowed to trial courts in permitting and
refusing them.    And when the refusal of such disparaging
questions, not strictly relevant and material to the issue, is
the subject of complaint, a court of review should hesitate
to  reverse  unless  the  exclusion  should  appear  to  have

involved a manifest abuse of such discretionary power.—
*Bate v. Hill, 1 Car. & P., 100 ; Turnpike Co. v. Loomis, 32
N. Y., 127 ; La Beau v. The People, 34 N. Y., 223 ; Com.
v. Jennings, 107 Mass., 488.*

The next objection relates to the question permitted to
be put to the witness Atwater by contestant, as to the rep-
utation of the named executor, Fitz Simmons.

The object of this question was, not to impeach Fitz
Simmons as a witness, but to show his general reputation
bad, as a circumstance reflecting upon the capacity of Mr.
Patterson, who, it was argued, would not, if in his right
mind, have been likely to appoint such a person as his
executor. It is true that the offer of this evidence was
accompanied by a statement that contestant would show
that Mr. Patterson, at the date of the will, knew that Fitz
Simmons' character was bad, and we do not discover any
direct evidence in the record of that fact. But it was not
necessary that Patterson's knowledge of the character of
Fitz Simmons should be proved by direct evidence, and
there was enough in the general facts and circumstances,
to justify an inference by the jury that Patterson possessed
the knowledge. Evidence was given by others of the same
nature and tendency, and without objection or condition.
We think the evidence was pertinent to the issue and
admissible.

The fourth assignment of error is based on a question
allowed to be put to Doctor Mottram, as to his opinion of
Mr. Patterson's capacity to plan and execute the paper pro-
pounded as a will. It is urged that the question, as under-
stood by the witness, involved an incorrect test of capacity.
But as the question appears in every substantial particular
to correspond with one we considered admissible when the
case was formerly here, we do not think it needful to dis-
cuss its propriety.

The fifth assignment of error complains of the admission
of the following question put to Doctor Mottram: " Suppose
Patterson had contemplated, before being taken sick, to give

to Mrs. Payne one hundred dollars,. and that when this clause of the will (referring to the clause giving her one hundred dollars) was read over to him on Friday forenoon he assented to that provision: what, in your opinion, was his capacity as to his giving an intelligent assent?" The propriety of this question is not necessarily to be settled by considering it as a substantive and independent inquiry, and wholly disconnected from the precedent course of proceeding. In order to judge of its import and admissibility, it is reasonable to recur to the circumstances under which it was made. The Doctor had been subjected to a long and very minute examination respecting Mr. Patterson's condition, and his opinion had been elicited upon groups of assumed facts which the evidence indicated. Carefully framed hypothetical questions had been put to him, and these, without being repeated in terms, were subsequently referred to as a basis for numerous additional inquiries, bearing on the question of Mr. Patterson's capacity. This course was wisely pursued to avoid needless prolixity. A long and critical cross-examination followed the same method, and assumed the particulars embodied in the last hypothetical question put on the direct examination, and the witness was then re-examined by contestant and asked this question: "These different stages of the disease in pleuro-pneumonia *that you have spoken of* are simply stages which mark the progress of the inflammation, are they not?" The witness answered, "Yes sir." It would seem that at this stage, as a matter of convenience, or for some reason not explained by the record, the witness was temporarily máde to leave the stand, but was soon afterwards placed upon it again in order that his examination might be resumed and completed. On resumption of the examination after this temporary interruption, the question objected to was put to the witness. On looking at the course of the examination, we think the question was fairly within legitimate limits as re-examination, and that the inquiry must have been understood as resting upon the hypothesis

pointed at by the cross-examination, to which the re-examination related.

But aside from this view, it is not certain but that the Doctor's personal knowledge of Mr. Patterson's condition was sufficient · to authorize him to answer this question, even if it were admitted to have been unconnected with assumed conditions of fact.—*Beaubien v. Cicotte, 12 Mich., 459, 501.*

The next point is made upon the exclusion of the question put by proponents to the witness Clark, who drew the paper propounded as a will. Mr. Clark had testified that about a year before he drew it, and on an occasion when Mr. Patterson and Thomas McGinnis were in his office, he made a memorandum respecting a land trade between them. He was then asked by proponents this question: "Now will you state who, upon the day this will was made, first mentioned the subject of the land trade between Patterson and Tom. McGinnis?" and the witness replied, "Mr. Patterson called my attention to it." This was followed by the question claimed to have been erroneously excluded. It was this: "Will you state what, if any, recollection *you* had upon the subject yourself?" This ruling was not objectionable. The question was not material. The witness had already shown that Mr. Patterson first referred to the matter, and was not indebted to any recollection Clark may possibly have had, and it was accordingly unimportant to ascertain whether or not Mr. Clark bore the subject in his memory.

The seventh assignment of error is grounded upon the refusal to charge according to proponents' second request, which was in these terms: "If the jury should find that, upon *the other testimony* relating to the testator's mental soundness, the evidence was balanced, the jury should permit the legal presumption of sanity to decide the question in the testator's favor."

There was no error in denying this request. When the question of capacity is actually controverted in case of a

paper propounded as a will, it devolves upon the proponents to establish capacity by other evidence than is afforded by the common-law presumption in favor of soundness of mind, and the measure of the evidence to establish must exceed that given in opposition.

Perhaps it would be going too far to say that the statute, in requiring substantive proof of the testator's soundness of mind as a prerequisite to the establishment of the will, intended to put aside altogether and for all cases the common-law presumption in favor of sanity. But conceding the existence of the presumption as a principle to operate subject to circumstances, it is very clear that it cannot have the force of an independent fact to serve as a substantial make-weight against counter proof. Because if it could, the rule of law which casts upon proponents the necessity of showing the testator's soundness of mind by other evidence might be subverted. The force and efficacy of the presumption will vary with cases, yet it can never have much influence when the issue upon the testator's sanity is contested in the usual way, by an appeal to those facts which bear upon it. And whatever force may be due to it in given instances will be owing, not to its intrinsic weight as a distinct item of proof, but to its operation in some degree, more or less, in rendering the circumstances adduced to prove sanity more persuasive.

Whenever the facts given in evidence are such as to leave room for it to have any appreciable influence upon results, it will be entitled to be viewed rather as a property of proponents' proofs, than as something apart, and then it will not fail to be recognized by the good sense of the jury, in its tendency to strengthen the other evidence favoring sanity. The efficacy of the presumption, when it has any in contested issues, can never be predetermined, nor can any rule about it be safely laid down; and the experience and general knowledge of the triers may be trusted to consider and estimate it rightly whenever occasions make the inquiry needful. In the present case we are unable to see

how any mere presumption in favor of Mr. Patterson's soundness of mind was entitled to much if any influence on the result. The court, however, charged that the law raised a presumption in favor of sanity, which the jury should consider, and the charge was, therefore, as favorable to proponents on this point, as any admissible view of the case authorized.

The fourteenth and sixteenth assignments of error are noticed together in proponents' brief. They complain of the charge given in response to the seventeenth request of contestant, and of that given without request, respecting testamentary capacity, and the intent and free action essential to the validity of the will. The charge on this branch of the case is quite full, and it is substantially if not precisely the same which was given on the first trial. At the former hearing in this court we thought it was not open to objection, and we see nothing to shake that opinion.

In the early part of the charge the judge advised the jury in the following terms: "No particular form of words is necessary to make a valid will. Words are used to express ideas and intent, and if the idea and intent may be *gathered* from the words, that is all that is necessary in this particular. The law does not require a testator, in order that he shall make a valid will, that he shall dictate the form and frame-work of the instrument; but the substance must be his, *and he must declare it to be his last will.* As to the signature, it is sufficient if it be by a cross or other mark by the testator as and for his signature." The fifteenth assignment of error complains of the passage here which says, that the testator must declare the instrument to be his last will. It will be observed that this passage merely speaks of a declaration as necessary, without explaining in what way it would be admissible to make it. In a subsequent part of the charge the explanation is given in these terms: "As to the publication of the will, I advise you that no *formal* declaration is necessary. The statute in that particular is *sufficiently complied with,* if the testa-

tor, by *words or actions indicates* that he *intends* the instrument as his will, and desires to have the witnesses attest it as such.    The testator need not, in terms, request the witnesses to attest the will."

These different portions of the charge were so naturally and intimately connected in sense that the jury must have understood the last as connected with, and explanatory of, the first, and so understood, the instruction, as a whole, was in substantial and almost literal compliance with the sixth and seventh requests which the proponents themselves preferred, and, therefore, if any error was committed, the proponents are not in a situation to complain of it.    If the point was open to them, we should perhaps hesitate about accepting the doctrine of the charge as the law of this state.—*Osborn v. Cook, 11 Cush., 532; Ela v. Edwards, 16 Gray, 91; Vincent v. The Bishop, 3 E. L. & E., 198; 15 Jur., 365.*

The remaining objection relates to that portion of the charge which referred to natural justice.    Whether those observations were needful to help the jury, is a matter of no moment. . We discover nothing in them in any way calculated to mislead the jury in point of law, or to warp the verdict.

Having examined all the points which plaintiffs in error thought of sufficient importance to merit discussion, and having discovered no error of which they can complain, we think the judgment should be affirmed, with costs.

The other Justices concurred.