PEOPLE v. AUERBACH.

1. CRIMINAL LAW—HOMICIDE—EVIDENCE.

While the court, on a trial for murder, did not err in receiving proof that the accused had inquired of the sheriff whether the proceedings taken after death of the decedent would answer in place of a death certificate, immediately following a conversation with the wife of deceased, saying he understood there was heavy life insurance, evidence relating to the insurance and terms and amount thereof should have been struck out on respondent's motion based on the ground that no evidence had been presented showing that respondent knew before the killing of the insurance, which was payable to the wife of decedent.

2. HOMICIDE—CONSPIRACY—TRIAL—CHARGE.

Where the prosecution claimed that the respondent and the wife of decedent conspired together to murder deceased for his insurance, and the evidence had no tendency to support the theory or that respondent, who claimed that the killing was accidental, knew of the life insurance, the subject should have been withdrawn from the jury, failure to do so constituting prejudicial error.

3. Same—Murder—Preliminary Examination.

Evidence that respondent and decedent were out hunting, when the latter was killed by a shot from behind, that respondent made some effort to keep matters secret, claiming that he set his gun against a stump and it fell off, was discharged and killed his companion, that the sheriff and others experimented with the same gun in the manner described by the prisoner and the experiments tended to contradict the claim of respondent, and that the parties had previously been very friendly, the wife of decedent and the prisoner especially so, and respondent had conducted himself peculiarly and had displayed a purpose to keep the matter secret after the shooting, warranted the examining magistrate in holding the accused for trial.

4. Criminal Law—Prosecuting Attorney—Appointment of Special Prosecutor—Homicide—Trial.

Under 1 Comp. Laws, § 2563 (1 How. Stat. [2d Ed.] § 1160), the appointment of a special prosecutor by the trial court because he considered the prosecuting attorney disqualified, who acquiesced in the action of the judge and withdrew, was justified and it will be presumed that a sufficient inquiry was made to sustain the order.

5. Same—Experiments.

It is within the discretion of the trial court to permit or refuse to permit experiments to be made in the presence of the jury.

6. Same.

And in ruling out evidence of experiments made by a witness with a shotgun which was of different construction and size than the rifle of respondent, that discharged the fatal shot, the discretion of the court was properly exercised.

7. Same—Trial—View—Right to Attend—Waiver.

A respondent may waive his right to attend a view of the premises in a criminal proceeding if he is at liberty and not prohibited by the court from attending, but the jury should not receive any evidence in his absence.

8. Appeal and Error—Argument—Conduct of Prosecutor—Saving Questions for Review.

In order to review improper argument of the prosecuting attorney it is essential to secure a ruling of the trial court.

9. Criminal Law—Charge—Trial.

The court should not have charged the jury as to the

course of the bullet into the body of decedent that it passed through horizontally, when the evidence in behalf of the accused tended to show the contrary.

10. SAME.

And it was error to instruct the jury that the prosecution claimed the motive of the crime was respondent's infatuation with the wife of deceased, and their mutual understanding to murder him in order to realize on the life insurance, since the evidence supporting that contention should have been withdrawn from the consideration of the jury.

11. APPEAL AND ERROR—CRIMINAL LAW.

The court, on error, will not review the refusal to give requested instructions, the subject of which is covered by the general charge, or objections to the introduction of evidence admitted without exception and properly raised for the first time on motion for a new trial.

Error to Lake; Withey, J.  Submitted April 18, 1913.  (Docket No. 133.)  Decided May 29, 1913.

Oscar M. Auerbach was convicted of murder in the first degree.  Reversed.

*B. N. Savidge,* for the people.

*Thomas Smurthwaite (James O. Murfin* and *Pierce Butler,* of counsel), for respondent.

STONE, J.  The information filed by the prosecuting attorney charges the respondent with having on the 19th day of September, 1912, at the township of Pleasant Plains, in the county of Lake, killed and murdered one Harry W. Fisher.  Upon the trial of the case, which occurred in the month of December, 1912, the respondent was convicted of the crime of murder in the first degree, and sentenced for life to the State prison at Jackson.  The case is here on writ of error, and exceptions after sentence.

The deceased was living on a somewhat new farm which had been purchased by him some seven miles

southwest of Baldwin, which he was improving, and was engaged in clearing, stumping, and ditching the land. He had formerly resided with his family in the city of Chicago and last came to this place in the spring of 1912. In the month of July he had been joined by his wife and two children, a boy nine or ten years old and a girl five, and they continued to live with him on the farm to the time of his death. The respondent was a member of this family and had been with the deceased since the spring of 1912. These parties lived together on this farm on terms of apparent friendship, and there was nothing on the surface to indicate anything except cordial good will between them all. They were all persons of intelligence and good education; the record showing that respondent is a civil engineer, and had been engaged in railroad construction work in Chicago. Respondent while working for deceased had charge of a steam grubber or stump machine used on the place.

The deceased met his death on the morning of September 19th before breakfast, and the only direct evidence of the circumstances attending his death was the testimony of respondent taken upon the coroner's inquest held at the house on the day aforesaid. On that occasion respondent testified: That he and deceased went hunting partridges that morning with a rifle, which appears to have been a 33-caliber Winchester. That some partridges flew up, and deceased did not want respondent to shoot at them because the gun was a high-power gun, and he did not want respondent to shoot on the wing for fear of hitting some one. That thereupon respondent leaned the gun against a stump carelessly, he did not just know how, and turned around to roll a cigarette, and the gun fell down, went off, and shot deceased. That when respondent turned around deceased had fallen. Respondent ran to him, turned him over, and saw that he was dead. Respond-

ent thinks the gun was cocked when he leaned it against the stump. That deceased did not speak after he was shot, but moaned once or twice. Respondent thinks deceased was facing the gun, and thinks he was about to sit down and light his pipe.

The sheriff of the county gave testimony as to the further statement of respondent before the coroner's jury, as follows:

"After the jury was impaneled, we went into the room where the body was lying. Then he (respondent) told us, and he also showed us after we went to the ground where the gun was setting when he set it down against the stump, as he claimed. He claimed that he and Mr. Fisher went out partridge hunting the day before, and that they flushed a few birds and were unable to get any of them, and this morning they went out to try again, and as they came near the place where Fisher's body was supposed to be found they flushed a bird or two, and one of them lit in near this place, and they followed it up, and the bird flew up, and he kind of made an effort to shoot or something of that kind, and Fisher warned him that he should not shoot because it was a high-power gun and there were people living off in that direction; that there might be some danger; so he didn't shoot, and then one of them proposed that they take a smoke before they went in to breakfast. It was getting about breakfast time. So he turns and sets this gun down against this small stump. Well, then he turns facing the north. Fisher was south of him, and he was contemplating something of that sort, rolling a cigarette, when he heard the gun go off and looked around and Fisher was down and so was the gun. He claimed he ran to Fisher; he was lying on his face; and he turned him over on his back, and Fisher gasped a very few times and was dead. This occurred on a side hill. I will say a slope up from the north and also from the east, and where they claim this occurred was a kind of clear space with bushes comparatively clear around it, and Fisher laid to the south end of this little open space, and at the north end there were three stumps, or rather two stumps and a fragment or part of a stump;

this set in a sort of a triangle, not a perfect triangle, but a little bordering on that. The fragment of stump was the stump farthest to the south; that is the stump or part of the stump which he claimed he set the gun against. Between the two stumps kind of north of that there was kind of a small log laid in there, or pole rather, and he claimed he stood between these two stumps facing the north when the gun was discharged. I saw the distance measured from the muzzle of the gun to where Fisher's feet were, and that was nine feet. Of course, I saw it measured another time when—well, there were other parties that had a little something to say about where the body lay, and I don't think they were as accurate as to measuring just from the muzzle of the gun or Fisher's feet, but they made it 12 feet. Mr. Auerbach didn't describe where the man lay as much as Mr. Sjoden. Mr. Sjoden was the one who claimed that he moved the body and also the gun. The one measurement was taken when Mr. Auerbach was present; that measurement showed a distance of 12 feet. This was made for the coroner's jury. I should say that the distance was half a mile from the Fisher home."

There is much detail in the evidence of witnesses who were upon or near the premises who were notified by respondent of the death of Fisher. One witness testified he was just going to his work of ditching from Mr. Sjoden's house, which was situate south of the Fisher home, when respondent came running to him, apparently out of breath and excited, and informed him that Mr. Fisher had been accidentally shot. They notified other parties, among whom were Mr. Sjoden, and this witness returned with respondent to the place where the body lay. The body was then lying upon the back. The witness described the location of the gun substantially as already stated, and testified that he remained there until Mr. Sjoden and others came with a team to remove the body to the house. The respondent, soon after the body was removed to the house, obtained an automobile and went to Baldwin and called upon an undertaker there, who testified that

respondent came to his place and informed him of the death of Mr. Fisher about 10 o'clock a. m.; that respondent came into the store and called the witness to the back part of the store and told him that Mr. Fisher was dead, had been accidentally shot; and that he would like to have the witness go down and prepare the body for shipment; would like to get the body away on the night train. Witness testified that he asked respondent if he had had any doctor, and he said, "No," and he was then told it would be necessary to have a coroner's inquest before witness could do anything, and respondent asked witness what would be necessary; and, as there was no coroner in the county, witness told him that the sheriff would be the man to look after that. Whereupon respondent asked witness to see the sheriff, and the witness went and called for the sheriff over the phone, but did not get him, as he was down town. They found the sheriff, and witness asked respondent if he wanted him to go out there with the hearse and get the body that afternoon, and he told him that he would rather not, because he did not want this to be made public at all, wanted it to be kept quiet as possible. A justice was found, and the parties all went to the Fisher home; and it was found necessary for respondent to return again to Baldwin after some men to serve on the jury.

Another witness, who was engaged in the lumber and hardware business at Baldwin, testified that he saw the respondent drive into town that forenoon in an automobile. This witness testified that when he first met respondent they shook hands and there was some general talk about bills which the witness was to send in; that respondent then talked with him and asked for some figures on some stuff witness had ordered that had not yet arrived; that respondent then requested witness to get him some water to put in the automobile, which he did; and the witness testified

that he did not observe anything in the appearance or demeanor of the respondent at this time different from what it had been on other occasions. Respondent asked witness if he cared to ride down to the depot with him in the automobile, which the latter did; that they talked on different subjects going down to the depot. The witness then testified:

"When we got down to the depot, as I went to step out of the automobile, he spoke to me and said, 'George, can you keep a secret?' And I says to him, 'I guess I know it,' or something to that effect; and he says 'Do you?' and I says 'Yes;' and he says, 'Who told you?' and I says, 'My brother, he is a deputy sheriff, and he told of it.' He says, 'Is that so?' I says, 'Yes.' He says, 'I want to send some telegrams; do you know this agent in here?' I says, 'Yes;' and he says, 'What kind of a fellow is he?' and I says, 'Well, Harry is a good fellow.' Harry was the fellow's name. He says, 'I wish you would go with me and help me send these telegrams and ask the agent to keep it still.' He says, 'I don't want a lot of gossip about it;' and I says, 'All right;' and I asked him then where the accident occurred; and he said it was down in a swale near the Cross cottage; and I says, 'What, was it accidental?' and he says, 'Yes, he only gasped once or twice;' and I says to him, 'Was there somebody with him?' and he says, 'Yes, I was with him.' So he went in and sent the telegrams which I wrote."

Upon the subject of life insurance the sheriff testified as follows:

"Shortly after Mr. Auerbach and I got to the Fisher home, why, he had been in the house, he came out of the house and asked me if our proceedings would answer the same as the death certificate, as he understood that Fisher was heavily insured. I had no particular talk with him at that time, only I told him I thought it would."

On cross-examination the same witness testified upon the subject as follows:

"I said Mr. Auerbach and Mrs. Fisher were talking

together, and that Mr. Auerbach then asked me if the proceedings we were taking would take the place of a death certificate; it was just before Auerbach left the Fisher home to go after the jurors, or just after he got back."

This is the only testimony in the case tending to show that respondent had any information or knowledge upon the subject of insurance upon the life of Mr. Fisher.

Upon the trial of the case, and against the objection and exception of respondent's counsel, evidence was offered and received showing that deceased carried insurance upon his life in the sum of $100,000 in the Prudential Insurance Company of America, consisting of two policies of $50,000 each, bearing date December, 1908, payable at his death, upon which policies there were two loans aggregating nearly $6,000. Ethel Patterson Fisher, wife of the deceased, was the beneficiary in each of these policies. It was also in evidence that the life of Mr. Fisher was also insured in the Northwestern Mutual Life Insurance Company by one policy of $100,000, on which there had been a loan of $6,600; that the date of that policy was December 5, 1908, and Ethel Patterson Fisher, wife of the assured, was the beneficiary; also, that there were two policies issued by the Mutual Benefit Life Insurance Company of Newark, N. J., amounting to $50,000, consisting of $25,000 each, bearing date March 17, 1908, upon which there had been a premium loan of $1,600. Mrs. Fisher was the beneficiary here also. All the policies matured and became payable upon the death of Harry W. Fisher, and all were incontestable after one year from their dates, except for nonpayment of premiums.

Counsel for the respondent moved the court to strike out all testimony relating to the insurance on the life of deceased. The court said:

"The first head of the general motion is that the testimony with regard to the insurance be stricken

out, for the reason that no knowledge is shown of the insurance on the part of the respondent. Knowledge on the part of the beneficiary will be presumed. Testimony of the relations of the respondent with the beneficiary are on the record. The statement of the respondent immediately after the death, or very soon after the death, showing that he then knew of the insurance, is in the record. I think the testimony in general is sufficient to retain the admission and retention of the testimony in regard to the insurance. * * * The motion is overruled and exception noted."

The evidence is uncontradicted that the body of the deceased was removed from the Fisher home to the undertaker's place of business at Baldwin on the evening of September 19th, and remained there until Mrs. Fisher and the children left with it upon the evening train of Friday, September 20th, bound for Chicago, where they arrived on the next morning.

The respondent was arrested before he left the Fisher home on the evening of September 19th, and remained in the custody of the sheriff from that time on until he was bailed out about the 14th of October.

Evidence was offered tending to show, and it is uncontradicted, that Mrs. Fisher remained in Chicago during Saturday, and while there met a friend who was engaged in the insurance business, who suggested and prepared the proofs of loss under the various insurance policies and obtained Mrs. Fisher's signature thereto, and it appeared that she filled out the answers to some of the questions asked her. These blanks were filled out and signed by her and sworn to before a notary. She then, with some friends, accompanied the remains to Independence, Iowa, the place of burial.

Before pleading to the information, respondent, by his counsel, moved to quash the information, for the reason that there was no jurisdiction on the part of the court because of the insufficiency of the testimony before the justice on the preliminary examination; and

that there was no evidence that would warrant holding the respondent to the circuit court. This objection was overruled and an exception noted.

Before the arraignment of the respondent in the circuit court the following occurred:

"*The Court* (addressing Mr. Cutler, prosecuting attorney): What is the situation in this Auerbach case, do you propose to act or not?

"*Mr. Cutler:* No, I am going to let Mr. Savidge proceed.

"*The Court:* In that case, Mr. Clerk, you may enter up an order appointing Mr. B. N. Savidge special prosecutor.

"*Respondent's Counsel:* We take a formal objection to a stranger appearing in the case for the people.

"*The Court:* Well, the order when drafted will recite the reasons why Mr. Savidge is appointed. It will be on the request of Mr. Cutler that Mr. Savidge be appointed, and because the court considers Mr. Cutler disqualified.

"*Respondent's Counsel:* We make the formal objection when the order is filed. * * *

"*Respondent's Counsel:* Has the order that the court made been filed?

"*The Court:* Yes, it has. The order appointing Mr. Savidge.

"*Respondent's Counsel:* As we understand the matter, Mr. Cutler is not interested by relationship to any of the parties, and has no personal interest in the case, nor the results thereof; therefore we enter a formal objection to the appointment of Mr. Savidge. We have nothing personal to Mr. Savidge, however, in the objection.

"*The Court:* Proceed.

"*Respondent's Counsel:* Give us an exception."

Whereupon, the respondent standing mute, a plea of not guilty was entered by order of the court, and the trial proceeded.

There was no *post mortem* examination.

It was a disputed question whether the bullet entered the body from the front or in the back. Upon

the theory that it entered the back, there was testimony tending to show that the bullet entered the body just below the shoulder blade on the right side, at a point nearly central between the back and the side; the point of exit being about three inches below the left nipple. There was testimony that the wound beneath the scapula was smooth, and the wound in the front was ragged, and a trifle larger. In the back one rib was broken, and in the wound in the front two ribs were broken. Other testimony tended to show that the ball may have entered from the front, or at least that it could not be definitely determined in the absence of a *post mortem* examination. It appeared that the wound in front was substantially opposite the one in the rear, as to the height; both being 50½ inches from the bottom of the feet.

Upon the trial evidence was offered and received upon the subject of experiments made by witnesses with the gun used by respondent at the time of the death of the deceased. The testimony tended to show that these experiments were made at the place where Mr. Fisher met his death. Testimony was also offered on behalf of respondent of experiments made by witnesses at the same place with a shotgun differing in length, size, and construction from the Winchester used by respondent on the morning in question.

At the close of the testimony the court announced that a request had been preferred early in the trial that the jury be permitted to view the premises where the tragedy was alleged to have occurred; and the court, after ascertaining that the jury desired to make the view, used the following language:

"Do any of the counsel on either side want to go with the jury?

"*Acting Prosecuting Attorney:* I do not, your honor.

"*Respondent's Counsel:* Well, I won't go. Mr.

Adams says he does not want to go unless the other side is represented.

"*The Court:* Well, now, if they go there I think that some one who knows ought to take this piece of stump and put it in place there, do you agree that that should be done?

"*Acting Prosecuting Attorney:* I will.

"*Respondent's Counsel:* Well, we will agree upon some party, Mr. Savidge, and we will discuss about it; for instance, now, Sjoden was there at the place and knows just where it came from. We will agree that he can place it.

"*Acting Prosecuting Attorney:* I will agree to that.

"*Respondent's Counsel:* He is the one that directed the jury to the locality.

"*The Court:* Now, the jury will remain in charge of the same officers who are under the same oath, and the oath will continue in full force all the time until the jury is again seated. And I think that no one should be allowed to go with them but you two officers, unless the man Sjoden is here. If he is not here, the sheriff will go and send him to that locality.

"*Respondent's Counsel:* Well, that is true, your honor; he is there at the house; he lives in the house now.

"*The Court:* You go by the house, I suppose?

"*Respondent's Counsel:* Yes, that is right, too.

"*The Court:* Very well, the officers can stop there and get him, and if it happens that he is not there, why go where he is, and if you are not able to get him probably you can see—some of the officers can see where the piece goes, and put it back. Of course, you will not allow any one to talk with the jurors at all or approach them in any way; and there will be no discussion among the jurors neither on the ground nor anywhere about it. I will say more to you about that if we make this arrangement. And Mr. Sjoden, or whoever places that stick in place, is not to discuss in any manner, or say anything at all; he is simply to go there and put that stick in place and go away. Not stay around there or show anybody anything.

"*Acting Prosecuting Attorney:* Who will make known to Mr. Sjoden what is expected of him?

"*The Court:* One of the officers in charge; either one of the officers. The officers will take the stick

with them and tell him that he is to place the stick in proper position as it was.

"*Respondent's Counsel:* What view of the premises does your honor permit, the locality from the house and barn?

"*The Court:* Well, they may do such things as they deem material there while they are on the ground.

"*Respondent's Counsel:* All right."

The court then instructed the jury that they were not to discuss the case at all, even among themselves, nor make up any opinion at all until the case was finally submitted to them; that they were to keep their minds open to conviction either way; and that they were not to hear anybody else talk about the case. No objection or exception was taken to the order of the court in this matter.

During the argument of the case to the jury, the acting prosecuting attorney, in alluding to the conduct of Mrs. Fisher with reference to the insurance, used the following language:

"What does she do? She sends for an insurance broker and puts in her time in Chicago while waiting there. And it would almost seem as though they sent and got the insurance blanks before he died—

"*Respondent's Counsel:* I take an exception to that."

In this connection it does not appear that the court made any ruling. There had been other exceptions taken to the argument of counsel prior to this time, and the ruling of the court had simply been to direct the prosecutor to proceed.

Although the prosecuting attorney in his brief has stated that he does not believe that this case comes within the rules laid down in the cases of conspiracy, yet a reference to his opening statement, as well as a reference to the charge of the court, and its reasons given for deying the motion for a new trial, will show that the case was tried upon the theory of a conspiracy

or combination between respondent and Mrs. Fisher. In its charge to the jury the court, among other things, said:

"Considerable testimony has been admitted in the case with regard to the relations of the respondent and the deceased's wife, Mrs. Fisher. This has been introduced largely for the purpose of showing an opportunity for Mrs. Fisher and the respondent to arrive at an understanding with regard to the taking-off, or death, of Mr. Fisher. The theory of the people is that that was arranged between Mrs. Fisher and the respondent for the purpose of realizing upon the life insurance carried by Fisher. And in view of that claim, and of that theory, it has become the duty of the court to admit in evidence in this case the acts of the parties both soon before the tragedy in question and the death of Mr. Fisher, and following along until the time of his burial. And the purpose of that testimony is for you to say—is to enable you to be able to say what the truth of the matter is. * * * It is claimed that the motive and actuating cause of this deed on the part of the respondent was the infatuation with Mrs. Fisher, and agreement and understanding reached between him and her that he should do this deed, and thus that she might realize upon the great life insurance carried upon her husband's life. * * * If you can arrive at a verdict in this case, it must be in the light of the conduct of these people and the relations that they sustained one to the other. If there was no understanding between Mrs. Fisher and the respondent, then there ought to be no conviction in this case. I don't mean by that, and the people do not mean by that, that you should be able to find Mrs. Fisher guilty of adultery with the respondent; that is not required, but the claim is that their conduct shows that their relations were unusual, and that ample opportunity existed for them to enter into this arrangement, if they were so disposed. * * * Bear in mind the testimony of the early inquiries by Mrs. Fisher in regard to the life insurance, and the inquiry a little later on the part of the respondent in regard to the life insurance, and what would be necessary to keep it intact."

In his reasons for denying the motion for a new trial the circuit judge, among other things, said:

"While there are other views that may be well taken, the case was tried upon the theory that the respondent and Mrs. Fisher arranged the killing, were both interested and guilty, and that Auerbach fired the shot."

The court in its charge used the following language:

"If, in your opinion, it makes any difference in the case, take into consideration and carefully analyze the testimony as to whether the shot was fired from the back or from the front; give especial attention and most critical examination to the fact of the course of the bullet through the body; it stands an admitted fact in this case, gentlemen, that the bullet passed through the body horizontally, that is on a direct, true line, say whether that can be true under the circumstances revealed in this case."

1. We shall first consider the matter of the insurance upon the life of Mr. Fisher, and the rulings of the court relating to the evidence upon that subject, as we deem that the most meritorious question raised by the assignments of error.

We think that the court did not err in receiving evidence of the statement of the respondent, when he made the inquiry of the sheriff above referred to, for everything cannot be proved at once upon the trial of a case. But at the close of the evidence of the fact, and amount, of the life insurance, all of which had been received against the objection and exception of respondent's counsel, and in view of the fact that all of the evidence of knowledge of such insurance on the part of the respondent was that above set forth, we are of opinion that the court erred in refusing to strike out all of the testimony upon the subject of the life insurance.

There was no evidence that respondent had any knowledge of the existence of the insurance at the time of the death of Mr. Fisher. It is more than probable

that he had been informed of this fact by Mrs. Fisher subsequent to the death, as he went direct from having had a conversation with her to the sheriff at the time he made the inquiry as to proofs of loss. The jury should not have been permitted to speculate or guess upon that question. As against the presumption of innocence, they should not have been permitted, in the absence of evidence, to presume that respondent possessed this knowledge at the time of or prior to the death of Mr. Fisher. The damaging effect of the course pursued is made apparent by an examination of the record and the charge of the court. The proper practice and course to be followed in such a case is well stated in *People* v. *Saunders,* 25 Mich. 119, where Justice COOLEY said:

"It is complained that the acts and declarations of Winters were allowed to be given in evidence before proof had been made of any conspiracy. As this exception regards the order of proof merely, we think it is not one that can avail in this court. The proper order of proof in cases of conspiracy is, first to give evidence of the unlawful combination, and afterwards to show the acts of the conspirators in pursuance thereof, or in some manner to connect them severally therewith. But it often happens that the existence of the conspiracy is only made out by inference from the acts and declarations of the several parties thereto; and to exclude evidence of these until the conspiracy is established in some other way would, in many cases, give the guilty parties immunity. There is no class of cases in which it is more important that the circuit judge should have a large discretion as to the order in which evidence should be received; and this discretion cannot be reviewed on error except in clear cases of abuse, of which we discover no proof here. The opening of the case by the prosecution and any further explanations that may be called for, will generally enable the judge to exercise his discretion in such manner as, while not shutting out proper evidence, shall at the same time protect the accused from being prejudiced by testimony which, in the end, shall prove

irrelevant, or not legally competent to charge the party on trial. And whenever facts are proved which depend upon other facts to give them a bearing upon the guilt of the accused, if such other facts are not put in, he has his remedy by motion to strike out the evidence.

"In this case it was sought to connect the several parties charged by evidence of their separate acts and statements. This was, of course, competent. The danger from this is that the statements of one implicating the others as well as himself, may tend unjustly to prejudice the case of the others; but this must be guarded against by proper instructions from the judge."

We feel warranted in saying, in the light of this record, that there was no competent or legal evidence —in fact, no evidence—that respondent had any knowledge whatever of the existence of the life insurance before the death of Mr. Fisher. This was essential to the admission of evidence of the fact of insurance, and the motion to strike out all evidence upon the subject of life insurance should have been granted.

A somewhat similar question arose in the case of *People* v. *Morgan,* 124 Mich. 527 (83 N. W. 275). There the respondent was upon trial for the murder of one Gillis. In that case Justice GRANT said:

"It was error to permit evidence that Mr. Bowen's life was insured. The prosecuting attorney stated that he would connect this evidence with what the prisoner had stated,—that 'there was a thousand dollars in it for any one who would do away with Dave Bowen.' The court admitted it, stating that, if the connection was not made, it would certainly be immaterial. The prosecution did not show that respondent had any knowledge whatever of this insurance; yet it is evident that this was urged as one of the reasons for his conviction. * * * Knowledge of this insurance on the part of the respondent should have been shown before introducing evidence of the fact of insurance."

Justice LONG concurred with Justice GRANT in reversing the case. MONTGOMERY, Chief Justice, said:

"I have some doubt upon the question relating to the life insurance. The record discloses that Mrs. Bowen knew of the insurance. There is no direct testimony to the effect that respondent did, but I think the jury might be permitted to infer such knowledge from the other circumstances of the case. If it is found that he was paramour to Mrs. Bowen, this fact, taken together with his offer of $1,000 to any one who would make away with Bowen, might justify an inference of knowledge."

Justice HOOKER concurred with MONTGOMERY, Chief Justice. Justice MOORE said:

"I cannot agree with Justice GRANT that a verdict of acquittal should have been directed, nor can I agree with Justice MONTGOMERY that the case should be affirmed. The record is barren of any testimony from which the inference can be fairly drawn that respondent had knowledge that Mr. Bowen had a life insurance policy which was payable to Mrs. Bowen. It is the testimony of Mr. Bowen that when he left Mrs. Bowen he took this policy with him, and that he could not say that his wife knew whether the policy was in force since then or not. There is no testimony that the respondent ever knew of the existence of this policy. I agree with the opinion of Justice GRANT as to the incompetency of the testimony in relation to the life insurance, and, for this error, think the conviction should be reversed and a new trial granted."

It is evident from an examination of this record that the subject of life insurance, and the amount thereof, and the fact that it was payable to Mrs. Fisher, were considered strong elements in the case, and these facts were urged by the prosecution as prominent reasons for the conviction of the respondent. We are of opinion that the refusal to strike out this evidence, and to withdraw the same from the consideration of the jury, constituted prejudicial and reversible error.

The only theory of the prosecution, of a conspiracy between respondent and the wife of deceased, includes the life insurance. That subject being eliminated

from the case, there was no other evidence tending to show a conspiracy sufficient to carry that question to the jury. The evidence not supporting that theory, the whole subject of a conspiracy should have been withdrawn from the jury, and the court erred in that part of its charge submitting that question in the language herein stated. The submission of these matters was highly prejudicial. The court in denying the motion for a new trial said:

"I have had and yet have some misgiving in regard to the legal sufficiency of the proofs."

As, in our view of the case, it must be sent back for a new trial, we think it our duty to consider some other questions that have been properly raised by exceptions and assignments of error.

2. It is urged by respondent's counsel that the court should have dismissed the proceedings and quashed the information before the jury was impaneled, because the preliminary examination, a record of which was before the court, showed that there was no competent evidence introduced before the examining magistrate authorizing him to hold the respondent for trial.

We have examined the record relating to the examination before the magistrate, and are unable to agree with respondent's counsel that, as matter of law, we should say there was not sufficient evidence to hold the respondent for trial. The evidence before the magistrate was substantially the same as upon the trial. The circumstances surrounding the case, in the very nature of things, were themselves peculiar and unusual. Circumstances testified to by witnesses as to subsequent conversation and conduct of the respondent, some of which it was claimed showed evidence of a desire to keep the matter of the death of Fisher secret and to avoid publicity, the evidence of the experiments, all of these facts taken together, we think, justified the magistrate in holding the respondent for trial; and we

do not think that the court erred in overruling the motion to quash the information.

3. This brings us to the subject of the order of the court appointing Mr. Savidge as special prosecutor in the case. We might well dismiss this subject for the reason that the record fails to show the order made by the court appointing Mr. Savidge. All we have is the announcement of the court that the order would be made on the request of Mr. Cutler, the prosecuting attorney, that Mr. Savidge be appointed because the court considered Mr. Cutler disqualified. When the court asked the prosecuting attorney if he proposed to act in the case, and he replied, "No, I am going to let Mr. Savidge proceed," it might well be claimed that he there acquiesced in, if he did not request, the appointment of Mr. Savidge as an assistant in the case.

Section 2563, 1 Comp. Laws, provides that, whenever the prosecuting attorney is unable to attend to his duties, if the court deems it necessary, it may, by an order to be entered in the minutes of such court, appoint some other attorney at law to perform for the time being the duties required by law to be performed by the prosecuting attorney, who shall thereupon be vested with all the powers of such prosecuting attorney for that purpose.

For aught that appears in this record, the court may have made the proper examination to reach the conclusion that it deemed it necessary to make this appointment. Such course should be presumed, in the absence of anything to the contrary. It appears here that the court announced that the order would recite the reasons why Mr. Savidge was appointed; and that it was because the court considered the prosecuting attorney disqualified.

Section 2569, 1 Comp. Laws (a more recent statute), provides that the prosecuting attorney may, under the direction of the court, procure such assistance in the

trial of any person charged with the crime of felony as he may deem necessary for the trial thereof. There is no claim here that Mr. Savidge was disqualified, or that he was an improper person to act in the case.

This court held, in *People* v. *Trombley,* 62 Mich. 278 (28 N. W. 837), that the assistant prosecuting attorney, who by statute is required to discharge all the functions and perform all the duties of the office of prosecuting attorney in case of absence, disability, or sickness of his superior officer, has power to sign, verify, and file an information when the statutory contingency arises.

There seems to be no question that such officer is competent to take charge of the trial of a criminal case.

This court, in the case of *People* v. *Bemis,* 51 Mich. 422-424 (16 N. W. 794), said that the prosecuting attorney, and any one associated with him, must be exclusively a representative of public justice, and stand indifferent as between the accused party and any private interest.

There is nothing in this record to show that Mr. Savidge's position was assailable upon any of these grounds. This precise question has never been presented to this court before. The following cases refer to the subject generally: *Webber* v. *Barry,* 66 Mich. 127 (33 N. W. 289, 11 Am. St. Rep. 466); *Sayles* v. *Genesee Circuit Judge,* 82 Mich. 84-89 (46 N. W. 29); *People* v. *Fuhrmann,* 103 Mich. 593 (61 N. W. 865); *People* v. *O'Neill,* 107 Mich. 556-559 (65 N. W. 540); *People* v. *Thacker,* 108 Mich. 652 (66 N. W. 562).

We do not think that the court erred in its action in this matter.

4. The forty-first and forty-second assignments of error are to the effect that the court erred in ruling that the witness Kinney could not give his opinion as to experiments made similar to those made by the

people's witnesses. The people had offered testimony bearing upon the subject of experiments made with the identical gun which was in possession of the respondent on the morning of the 19th of September, at the place where Mr. Fisher was said to have been killed. The experiments made by the witness Kinney were not made with the gun above referred to, but with a double-barrel shotgun, which differed in length and construction from the gun in possession of respondent. The witness was asked to state the result of these experiments, whether or not falling in different ways and striking the prongs the gun could be discharged. This was objected to as incompetent. The court in ruling upon the question said:

"I don't think that is a matter for expert testimony. The further difficulty with that is that the guns are entirely dissimilar, the trigger guards are dissimilar, the action of a shotgun and rifle is known to be dissimilar. I will sustain the objection."

To which ruling counsel for respondent excepted.

The weight of authority seems to be that it is within the judicial discretion of the trial court whether to permit experiments relevant to the issue to be made before the jury during the trial, or to refuse to permit them, and an appellate court should decline to interfere with the ruling unless an abuse of its judicial discretion is clearly made to appear. *Spires* v. *State*, 50 Fla. 121 (39 South. 181, 7 Am. & Eng. Ann. Cas. 214, and note). In this note will be found a large collection of the cases upon this subject.

We are of opinion that the court did not err in its ruling, especially for the reason that the guns were dissimilar, and such evidence might have had a tendency to confuse rather than to enlighten the jury.

5. It is next urged that the court erred in permitting the jury to view the premises where the death occurred. We have stated in detail what the record

shows upon this subject. The record fails to disclose upon whose motion the view was permitted. It is apparent that it was by the consent of counsel for both parties. But it is urged by respondent's counsel that this view was a proceeding in the case which could not have taken place without respondent's presence, and that he could not waive his right to be present.

It will be borne in mind that it appears that respondent was not confined in jail, but was on bail during his trial. There was no express order of the court that he should be prohibited from attending the view. However, it does appear that the court said, substantially, that nobody but the officers would attend, with the exception of the man Sjoden.

Section 11951, 3 Comp. Laws (5 How. Stat. [2d Ed.] § 15123), provides that no person indicted for a felony shall be tried, unless personally present during the trial.

Where one on trial for a felony, who was out on bail, failed to appear at the hour to which court adjourned pending the jury's deliberation, a verdict rendered in his absence was held valid, and a waiver on part of respondent. *Frey* v. *Calhoun Circuit Judge*, 107 Mich. 130 (64 N. W. 1047).

Section 11952, 3 Comp. Laws (5 How. Stat. [2d Ed.] § 15124), provides that the court may order a view by any jury impaneled to try a criminal case whenever such court shall deem such view necessary. The matter of the view of the place where an alleged crime has been committed seems to be discretionary with the court. The question whether the purpose of the view is to furnish new evidence, or to enable the jurors to comprehend more clearly by the aid of visible objects the evidence already received, is one upon which the courts seem to be divided; the better doctrine being the latter of the above propositions. It certainly would be improper to permit a witness to

testify as to the location of objects, or as to any other material point in the presence of the jury while taking the view. 12 Cyc. p. 537, and cases cited.

The most serious question here is whether permitting the witness Sjoden to place the stump in its original position was evidence in the case. Much authority may be found collected in the note to the case of *Elias* v. *Territory*, 9 Ariz. 1, found reported in 11 Am. & Eng. Ann. Cas. 1153-1159.

The only Michigan case that we have been able to find bearing on this question is that of *People* v. *Hull*, 86 Mich. 449 (49 N. W. 288). There the jury viewed the premises and were accompanied by the circuit judge, counsel, officers of the court, and representatives of the daily press. The respondent was confined in jail during this time. The principal complaint in that case was that the court erred in not keeping the jury together under the supervision of the court while the view was being made, and in not taking measures to prevent the jury from partaking of spirituous liquors while the view was being had. Justice Long, in speaking for this court, said:

"The court was not in error in permitting or directing a view of the premises by the jury; but we think it was the duty of the court, *in the absence of the respondent*, to have kept the jury while on their way to, and on their return from, and in their view of, the premises, under the supervision of an officer, so that no person might communicate with them or express any opinion, or give any directions in their hearing; *for anything which took place which was in the nature of testimony certainly could not be given to the jury in the absence of the respondent.*"

We think that the weight of authority is to the effect that a respondent who is at liberty may expressly waive his right to accompany the jury, but that the jury in no case should take anything in the nature of evidence, in his absence. We also think that the re-

spondent had the right to accompany the jury, had he desired to do so in this case. More than this, it is not necessary for us to decide, as the question is not likely to occur upon a new trial in view of what we have said.

6. Error is assigned upon the argument of counsel for the people. This argument consisted of a somewhat extravagant statement as to the conduct of Mrs. Fisher with reference to making proofs of loss while in Chicago. The record is not clear that the attention of the court was called to the matter, or that the court was requested to make a ruling upon the subject. We are not able to say that the court refused to rule in this instance. The language used was doubly objectionable, as it was not only an extravagant statement in view of the evidence, but it goes to show the use which was made upon the argument of the subject of the life insurance. Such error is not likely to occur upon a new trial.

7. The eightieth assignment of error complains of that portion of the charge above quoted as follows:

"Give especial attention and most critical examination to the fact of the course of the bullet through the body. It stands an admitted fact in this case, gentlemen, that the bullet passed through the body horizontally, that is, on a direct, true line; say whether that can be true under the circumstances revealed in this case."

One infirmity in this portion of the charge is that it was not an admitted fact in the case that the bullet passed through the body horizontally. There was much evidence in the case, which we have not deemed it necessary here to collect, that the body may have been in a stooping posture at the time the wound was inflicted. A number of witnesses testified to the common habit of deceased in stooping down while talking, or resting, and there was medical testimony to the effect that it was impossible, in the absence of a *post mortem* examination, to testify to the course of the

bullet through the body. It is not probable that this error will be repeated upon a new trial.

8. The eighty-third assignment of error complains of that portion of the charge of the court above copied, using this language:

"It is claimed that the motive and actuating cause of this deed on the part of the respondent was the infatuation with Mrs. Fisher, and agreement and understanding reached between him and her that he should do this deed, and thus that she might realize upon the great life insurance carried upon her husband's life."

Because of what we have said upon the subjects of the life insurance and conspiracy, further comment upon this portion of the charge is not necessary. That it was probably very damaging to the respondent is evident, in view of the course which the trial took.

Error is also assigned upon the refusal of the court to charge the jury as requested by respondent's counsel. We have examined these requests with some care, as well as the charge, and are of opinion that such of the requests as correctly stated the law upon the subject were covered by the court in its general charge. This court has uniformly held that it is not error for the trial judge to refuse to charge as requested, where the charge as given states the law applicable to the case correctly and covers all the points in such of the requests as were proper. *Fisher* v. *People,* 20 Mich. 135; *McGinnis* v. *Kempsey,* 27 Mich. 363; *Joslin* v. *Le Baron,* 44 Mich. 160 (6 N. W. 214) ; *People* v. *Beverly,* 108 Mich. 509-512 (66 N. W. 379) ; *People* v. *Sauerbier,* 173 Mich. 521 (139 N. W. 260).

Many questions are sought to be raised upon the motion for a new trial relative to the introduction of evidence, where no exceptions were taken. The consideration of these has not been had in the decision of the case, but we wish to call attention to the rule that failure to except to the admission of evidence prevents

a review of the question on writ of error, notwith-
standing a motion for a new trial on that ground.
*Conger* v. *Hall*, 158 Mich. 447 (122 N. W. 1073). See,
also, *McWilliams* v. *Railway Co.*, 146 Mich. 216 (109
N. W. 272).

For the reasons stated, the conviction and judgment
in the court below are reversed, and a new trial
granted. Respondent will be remanded to the sheriff
of Lake county to be dealt with according to law.

STEERE, C. J., and MOORE, MCALVAY, BROOKE,
KUHN. OSTRANDER, and BIRD, JJ., concurred.